# Illinois Official Reports

## Supreme Court

---

### *People v. Holman*, 2017 IL 120655

---

| | |
|---|---|
| Caption in Supreme Court: | THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. RICHARD HOLMAN, Appellant. |
| Docket No. | 120655 |
| Filed | September 21, 2017 |
| Decision Under Review | Appeal from the Appellate Court for the Third District; heard in that court on appeal from the Circuit Court of Madison County, the Hon. Charles V. Romani, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Michael J. Pelletier, State Appellate Defender, Ellen J. Curry, Deputy Defender, and Amanda R. Horner, Assistant Appellate Defender, of the Office of the State Appellate Defender, of Mt. Vernon, for appellant. |
| | Lisa Madigan, Attorney General, of Springfield (David L. Franklin, Solicitor General, and Michael M. Glick and Gopi Kashyap, Assistant Attorneys General, of Chicago, of counsel), for the People. |
| | Bluhm Legal Clinic, of Chicago (Shobha L. Mahadev and Scott F. Main, of counsel, and Mila Babic and Betsy Varnau, Law Students), for *amicus curiae* Children & Family Justice Center. |

Justices                    JUSTICE THEIS delivered the judgment of the court, with opinion.

Chief Justice Karmeier and Justices Freeman, Thomas, Kilbride, Garman, and Burke concurred in the judgment and opinion.

**OPINION**

¶ 1      The central issue in this case is whether defendant Richard Holman, who received a sentence of life without parole for a murder that he committed at age 17, is entitled to a new sentencing hearing pursuant to *Miller v. Alabama*, 567 U.S. 460, 132 S. Ct. 2455 (2012). We hold that the defendant's original sentencing hearing complied with *Miller* and affirm the Madison County circuit court's decision to deny his motion for leave to file a successive postconviction petition.

¶ 2                              BACKGROUND

¶ 3      On July 13, 1979, Rodney Sepmeyer returned from work to the rural house near downstate Maryville where he lived with his 83-year-old grandmother, Esther Sepmeyer. Inside, Rodney found Esther's dead body kneeling and slumped forward over the side of a bed in a bedroom that they shared. She had been shot in the cheek just below the right eye, and a pool of blood stained the sheets. The house was ransacked, and a television, a turntable, a radio, and a lawnmower were missing. Rodney's .22-caliber rifle also was missing, and the metal cabinet in the bedroom where he stored the gun was open.

¶ 4      Rodney summoned his father, Lenard, who lived nearby. Lenard called the police. A crime scene technician found a spent .22-caliber shell casing at the base of the bedroom heating stove, as well as the empty rifle box and an empty box of rounds on the kitchen floor. The technician lifted latent fingerprints from the handle of a small mirror left on the bedroom floor and from the door of the metal cabinet. The coroner's physician later recovered a .22-caliber bullet from Esther's neck. According to the physician, Esther was likely knocked unconscious after being shot, but she may have lived for as long as a half-hour. After the autopsy, the investigation of Esther's murder stalled.

¶ 5      Several weeks later, the defendant and Girvies Davis were arrested and incarcerated in the St. Clair County jail for an unrelated offense. While there, the defendant and Davis both made inculpatory statements about their collaboration in a crime spree through Madison and St. Clair Counties. In his own handwriting, Davis listed 11 homicides, shootings, and robberies, which included Esther's murder. The defendant told police officers about eight homicides, all of which appeared on Davis's list, in addition to Esther's murder. Regarding that offense, both the defendant and Davis admitted that they took items from her house, but each accused the other of being the shooter.[1] They were charged by information with three counts of first degree

---

[1]The defendant's statement was reduced to writing several months after it was made by the police officer who interrogated him. That written statement does not appear in the record, but the officer testified at trial as to its contents. Davis's statement was reduced to writing by another police officer the day it was made. That written statement does appear in the record, as well as in *People v. Davis*, 97 Ill. 2d 1, 8-9 (1983).

murder. The police obtained a warrant and searched Davis's residence, where they found the radio and the lawnmower.[2] The State's fingerprint expert later matched the defendant's left index fingerprint to the fingerprints lifted from the mirror and the cabinet.

¶ 6 The defendant and Davis were tried together. On March 16, 1981, a jury found the defendant guilty of first degree murder.[3] Because he was five weeks from his eighteenth birthday at the time of the offense, he was not eligible for the death penalty. See Ill. Rev. Stat. 1979, ch. 38, ¶ 9-1(b). The multiple-murder sentencing statute in effect at that time provided that the court "may sentence the defendant to a term of natural life imprisonment" if any of the aggravating factors in section 9-1(b) of the Criminal Code of 1961 were present. Ill. Rev. Stat. 1979, ch. 38, ¶ 1005-8-1(a)(1). One of those aggravating factors was the prior murders of two or more persons. Ill. Rev. Stat. 1979, ch. 38, ¶ 9-1(b)(3). The case proceeded to sentencing.

¶ 7 The Madison County circuit court's probation and court services department prepared a presentence investigation report (PSI).[4] The PSI included the defendant's criminal history. At age 14, he was adjudicated delinquent for burglary and placed on two years' probation. At age 15, he was adjudicated delinquent for three counts of criminal damage to property and committed to the Department of Corrections' juvenile division. The defendant was paroled and then arrested for burglary three months later. His parole was revoked, and he was returned to the Department of Corrections. The defendant was paroled again at age 17. While he was free, Esther was murdered. The PSI contained the defendant's statement to the probation officer about that offense:

"I fenced the stolen stuff but I didn't commit the home invasion. I wasn't present when the murder took place. Girvies Davis made a statement indicating my name. That gave police enough grounds to question me. I refused to talk because I didn't know anything."

¶ 8 The PSI stated that the defendant's father died when the defendant was around 7 years old, and his stepfather died when he was around 16. The defendant reportedly had "a close, loving relationship" with his mother and six siblings. He was never married but reportedly had two young children. The defendant was healthy and suffered from no known physical disabilities. According to the PSI, the defendant had between seven and nine years of formal education, but he was "borderline retarded." The probation officer concluded:

"The defendant expressed no guilt for this offense or remorse for the victim, who was an 82 year old woman who posed no physical threat to him.

---

[2]Davis's statement explained why the police never recovered the television or the rifle. According to Davis, he and the defendant sold the television at a bar and then "drove halfway across [the pay bridge] and threw the 22 rifle into the river" on the night of Esther's murder. The missing turntable was never mentioned or found.

[3]Davis was also found guilty. He received the death penalty, but this court vacated that sentence and remanded for a new sentencing hearing. *Davis*, 97 Ill. 2d at 29. Earlier, Davis received the death penalty for the first degree murder of Charles Biebel. See *People v. Davis*, 95 Ill. 2d 1 (1983). Evidence at that trial indicated that the defendant was the "actual triggerman" responsible for Biebel's death. *Davis*, 97 Ill. 2d at 24.

[4]The first page of the PSI erroneously stated the defendant's birth date as August 20, 1960, but later stated it correctly as August 20, 1961.

The defendant's history of senseless criminal acts of mortal violence toward others and lack of remorse for his victims indicates to this officer that the defendant has no predilection for rehabilitation."

¶ 9 Attached to the PSI were three psychological reports—two from a psychiatrist, Dr. Syed Raza, and one from a psychologist for the circuit court's probation department, Cheryl Prost. Dr. Raza's initial report described his interview with the defendant. The defendant offered an alternate version of the events on the date of Esther's murder. According to the defendant, he drove Davis's wife to work, drank beer at a bar with Davis, took a nap at home, picked up a girl, visited another bar and a "dice house," and ended up at home. He awoke the next morning and heard police officers speaking to his mother. The defendant was taken to the St. Clair County jail, where a detective interrogated him. He asserted that he did not understand most of the questions, and the detective "seemed mad at him and hit him." The defendant then was informed that he was charged with murder. Even though the defendant attended his own trial, he insisted that he still did not know who had been murdered or how the crime occurred: "My lawyer won't tell me either. They say I am stupid."

¶ 10 Dr. Raza noted that the defendant mentioned an incident prior to 1977 when he fell from a two-story building and hit his head. Afterwards, he was seen by a psychiatrist in Rockford. The defendant did not believe that he had a drinking problem. He had used marijuana for almost a year before his arrest. Dr. Raza found that the defendant's attitude was "a mixture of extreme apprehension with a sense of hopelessness, some depression and maybe a touch of manipulativeness." The interview was difficult because the defendant's eye contact was extremely poor and his answers were very vague. Dr. Raza detected no "thought disturbance" and tentatively diagnosed the defendant with "borderline or dull normal intelligence, acute reactive anxiety and some depression," pending further evaluation and testing.

¶ 11 Prost's report described her interview with and tests of the defendant. The defendant again mentioned his childhood fall and stated that, since then, he had had a severe headache "like dynamite ready to explode," which he treated with aspirin every day. Contrary to the PSI, Prost reported that the defendant stated that he was in seventh grade remedial classes before dropping out of school. On an intelligence test, the defendant scored in the borderline or mildly retarded range. Prost attributed some of his performance to "neurological impairment." Other tests confirmed that and indicated a high probability of organic brain damage. Prost recommended a neurological evaluation.

¶ 12 After reviewing Prost's report, Dr. Raza made an addendum to his initial report. Dr. Raza stated that he had reviewed the medical records of the defendant from the Warren G. Murray Children's Home in Centralia, where the defendant lived for two months in 1976. The records showed that the defendant received a full physical examination, which revealed no deficits. He was diagnosed as mildly mentally retarded. According to Dr. Raza, therapists at the home stated that the defendant "is at times not aware of his surroundings and is easily led into doing 'bad deeds,' " due to his lack of confidence and high need for approval from more intelligent peers. Dr. Raza observed that the defendant's intelligence test results improved between his time at the children's home and his interview with Prost: "This improvement can be explained by growing up in chronological age and maturation process of his central nervous system." The defendant's verbal intelligence indicated that he does have capacity for making a "socially appropriate judgment." Dr. Raza opined, "Taking all these factors into consideration, it is my

- 4 -

opinion that I do not see him as severely handicapped in terms of intellectual ability as to interfere with his ability to see right from wrong."

¶ 13 At the sentencing hearing, the State presented one witness, a former East St. Louis homicide section police officer. The officer stated that he investigated the murder of Frank Cash and the attempted murder of John Ostman and that he testified in the defendant's trial for those offenses. The officer also stated that he investigated the murder of John Oertel and that he testified in the defendant's trial for that offense. Oertel was killed roughly two months before Esther, while the defendant was still 17 years old. Cash was killed a month after Esther, after the defendant had turned 18. The State introduced certified copies of the defendant's convictions in both cases. In the former he received concurrent 35- and 25-year sentences. In the latter he received a 40-year sentence.

¶ 14 Before closing arguments, the defendant's attorney told the court that the defendant did not want to offer any mitigating evidence and that the defendant's mother did not want to testify on his behalf. Consequently, the defendant's attorney conceded, "I have no evidence to present at this time" and declined the trial court's invitation to make any additions, corrections, or modifications to the PSI. In closing, the prosecutor highlighted the defendant's criminal history and the fact that he was on parole when Esther was murdered. According to the prosecutor, Esther was old and feeble and posed no threat to the defendant. The prosecutor noted that the defendant still denied any involvement in the murder, despite his fingerprints at the scene. The prosecutor added:

"I believe more than about any other Defendant that I have seen come through here Mr. Holman deserves to be removed from society for the rest of his natural life. It's only an accident of birth that he did not qualify for the death penalty, having been too young when these offenses were committed to have qualified. Not being able to seek the death penalty on Mr. Holman, I believe that we have to seek the next best thing ***. *** I believe that the life sentence here is necessary to deter others from going out on similar crime sprees ***."

¶ 15 The defendant's attorney argued that the question before the court was whether the court "should assess natural life to this very young man." The defendant's attorney asked the court to consider rehabilitation as a goal and argued that isolation in the prison system militates against that goal. Finally, the defendant's attorney pleaded with the trial court to consider "some other alternative than that requested by the State and to give this young man an opportunity."

¶ 16 The trial court offered the defendant an opportunity to make a statement. The defendant said:

"Your Honor, [the prosecutor] made the statement that I was convicted of several—three counts of Murder before. That I have been convicted as of what they say as accessory of the Murder, of knowing this Murder have taken place. I was never convicted of no Murder. And that is my statement."

¶ 17 Then the trial court spoke:

"In this sentence the Court has considered the factors enumerated in the Criminal Code as factors in Mitigation and factors in Aggravation. The Court does not find any factors in Mitigation. There are many factors in Aggravation. The Court has considered the evidence presented at the trial in this cause. The Court has considered the presentence investigation. The Court has considered the evidence presented at this

hearing today and the arguments of counsel. And the Court believes that this Defendant cannot be rehabilitated, and that it is important that society be protected from this Defendant.

It is therefore the sentence of this Court and you are hereby sentenced, Mr. Holman, to the Department of Corrections for the rest of your natural life."

¶ 18 The defendant appealed his conviction but did not challenge his sentence. The appellate court affirmed the conviction. *People v. Holman*, 115 Ill. App. 3d 60 (1983).

¶ 19 In 2001, the defendant filed two *pro se* postconviction petitions. Both petitions were dismissed, and the defendant's appeals from those rulings were also dismissed. In 2009, the defendant filed a *pro se* "petition for relief from void judgment" under section 2-1401 of the Code of Civil Procedure. See 735 ILCS 5/2-1401 (West 2010). That petition was denied, and the appellate court affirmed. *People v. Holman*, 2011 IL App (5th) 090678-U.

¶ 20 In 2010, the defendant filed a *pro se* petition for leave to file a successive postconviction petition, the pleading that began the case before us. The defendant raised several claims; his final claim purported to assert his actual innocence. That petition was denied. On appeal, the defendant abandoned his earlier claims and instead argued that his life sentence was unconstitutional under *Roper v. Simmons*, 543 U.S. 551 (2005), *Graham v. Florida*, 560 U.S. 48 (2010), and particularly *Miller*. The appellate court rejected that argument because the defendant had not raised it before the trial court. *People v. Holman*, 2012 IL App (5th) 100587-U, ¶ 18. The appellate court further noted that the defendant's sentence was not unconstitutional under *Miller* because the defendant here was "afforded a 'sentencing hearing where natural life imprisonment [was] not the only available sentence.' " *Id.* ¶ 19 (quoting *People v. Morfin*, 2012 IL App (1st) 103568, ¶ 59). The defendant appealed.

¶ 21 While the defendant's petition for leave to appeal was pending before us, we decided *People v. Davis*, 2014 IL 115595, which held that *Miller* announced a new substantive rule of constitutional law and that rule applied retroactively. Consequently, we denied the defendant's petition but vacated the appellate court's initial decision in this case and remanded so that court could consider whether, in light of *Davis*, a different result was warranted. *People v. Holman*, No. 115597 (Jan. 28, 2015) (supervisory order).

¶ 22 On remand, the appellate court reached the merits of the defendant's *Miller* claim. 2016 IL App (5th) 100587-B. The appellate court recognized that *Miller* and, more recently, *Montgomery v. Louisiana*, 577 U.S. ___, 136 S. Ct. 718 (2016), require trial courts to consider youth and its attendant characteristics before imposing life sentences on juveniles. 2016 IL App (5th) 100587-B, ¶¶ 35-37. Because the trial court in this case did so, the defendant's sentence was constitutionally permissible. *Id.* ¶ 46. The appellate court rejected the defendant's alternative argument that *Miller* should be extended to create a categorical ban on juvenile life sentences. *Id.* ¶ 52.

¶ 23 This court allowed the defendant's petition for leave to appeal. Ill. S. Ct. R. 315(a) (eff. Mar. 15, 2016). We also allowed the Children & Family Justice Center of the Bluhm Legal Clinic at Northwestern Pritzker School of Law to file an *amicus curiae* brief in support of the defendant. See Ill. S. Ct. R. 345 (eff. Sept. 20, 2010). On the legal issues before us, our review is *de novo*. *People v. Thompson*, 2015 IL 118151, ¶ 25.

ANALYSIS

The Post-Conviction Hearing Act offers a procedural device through which a criminal defendant may assert that "in the proceedings which resulted in his or her conviction there was a substantial denial of his or her rights under the Constitution of the United States or of the State of Illinois or both." 725 ILCS 5/122-1(a)(1) (West 2010). Proceedings on a postconviction petition are collateral to proceedings in a direct appeal and focus on constitutional claims that have not and could not have been previously adjudicated. See *People v. Towns*, 182 Ill. 2d 491, 502 (1998). Accordingly, issues that were raised and decided on direct appeal are barred from consideration by the doctrine of *res judicata*; issues that could have been raised, but were not, are forfeited. See *People v. Ortiz*, 235 Ill. 2d 319, 328 (2009). The Act itself contemplates the filing of a single petition: "Any claim of substantial denial of constitutional rights not raised in the original or an amended petition is waived." 725 ILCS 5/122-3 (West 2010). Because successive petitions impede the finality of criminal litigation, that statutory bar will be relaxed only " 'when fundamental fairness so requires.' " *People v. Coleman*, 2013 IL 113307, ¶ 81 (quoting *People v. Pitsonbarger*, 205 Ill. 2d 444, 458 (2002)).

Generally, there are two such instances. See *People v. Edwards*, 2012 IL 111711, ¶ 22. A defendant may raise a due process claim of actual innocence to prevent a miscarriage of justice (*Coleman*, 2013 IL 113307, ¶ 83), or a defendant may raise any other defaulted constitutional claim by satisfying the so-called "cause-and-prejudice" test (*id.* ¶ 82). To establish "cause," the defendant must show some objective factor external to the defense that impeded his ability to raise the claim in the initial postconviction proceeding. *Pitsonbarger*, 205 Ill. 2d at 460. To establish "prejudice," the defendant must show the claimed constitutional error so infected his trial that the resulting conviction violated due process. *Id.* at 464. The cause-and-prejudice test has been codified in the Act. See 725 ILCS 5/122-1(f) (West 2010); *People v. Tidwell*, 236 Ill. 2d 150, 156 (2010).

Initially, the State contends that the defendant's *Miller* claim is "thrice-forfeited" because he failed to raise an as-applied challenge to his sentence in his 2010 motion for leave to file a successive postconviction petition, his 2012 pre-remand appellate court briefs, and his 2013 pre-remand petition for leave to appeal. Relying upon *People v. Jones*, 213 Ill. 2d 498, 505 (2004), the State asserts that a claim not raised in a postconviction petition cannot be raised for the first time on appeal. The State insists that the defendant's as-applied *Miller* claim must be presented to the trial court in a motion for leave to file a successive postconviction petition.

The defendant contends that the State forfeited its forfeiture argument because that argument was raised for the first time in the State's response brief before this court. The defendant's point is well taken. If the State's position is that the defendant should have raised his as-applied *Miller* claim in a motion for leave to file a successive postconviction petition, the State should have made that argument during supplemental briefing on remand when the defendant originally presented that claim. See *People v. Lucas*, 231 Ill. 2d 169, 175 (2008) ("The doctrine of forfeiture applies to the State as well as to the defendant and the State may forfeit an argument that the defendant forfeited an issue by not properly preserving it for review.").

The State's forfeiture aside, we would still reach the merits of the defendant's claim. In *Thompson*, 2015 IL 118151, ¶¶ 36-37, we explained the difference between facial and as-applied constitutional claims:

"Although facial and as-applied constitutional challenges are both intended to address constitutional infirmities, they are not interchangeable. [Citation.] An as-applied challenge requires a showing that the statute violates the constitution as it applies to the facts and circumstances of the challenging party. [Citation.] In contrast, a facial challenge requires a showing that the statute is unconstitutional under any set of facts, *i.e.*, the specific facts related to the challenging party are irrelevant. [Citation.]

Because facial and as-applied constitutional challenges are distinct actions, it is not unreasonable to treat the two types of challenges differently \*\*\*. By definition, an as-applied constitutional challenge is dependent on the particular circumstances and facts of the individual defendant or petitioner. Therefore, it is paramount that the record be sufficiently developed in terms of those facts and circumstances for purposes of appellate review."

¶ 30 The defendant's claim in *Thompson* illustrated that point. The defendant there maintained that the evolving science on juvenile maturity and brain development highlighted in *Miller* applied not only to juveniles but also to young adults like himself between the ages of 18 and 21. *Id.* ¶ 38. We rejected that claim because the record contained "nothing about how that science applies to the circumstances of defendant's case, the key showing for an as-applied constitutional challenge." *Id.* We stated the trial court was the most appropriate tribunal for such factual development. *Id.*

¶ 31 *Thompson* mentioned *Davis*, where we held that the statute under which a juvenile defendant received a mandatory life sentence was not facially unconstitutional under *Miller*. *Davis*, 2014 IL 115595, ¶ 32. We also held that *Miller* applied to, and invalidated, that sentence, even though the defendant's *Miller* claim was raised for the first time on appeal. *Id.* ¶ 43. We excused the defendant's failure to raise an as-applied *Miller* claim sooner because the record was sufficiently developed to address that type of claim.

¶ 32 *Thompson* instructs that a defendant must present an as-applied constitutional challenge to the trial court in order to create a sufficiently developed record. *Davis* creates a very narrow exception to that rule for an as-applied *Miller* claim for which the record is sufficiently developed for appellate review. Here, in deciding the defendant's first petition for leave to appeal, we directed the appellate court to reconsider its judgment in light of *Davis*. Like the *Miller* claim in *Davis*, the *Miller* claim in this case does not require factual development. All of the facts and circumstances to decide the defendant's claim—that his sentencing hearing did not comply with *Miller*—are already in the record. Consequently, in the interests of judicial economy (see *People v. Bailey*, 159 Ill. 2d 498, 506 (1994)), we choose to address the merits of the defendant's claim, rather than requiring him to return to the trial court to file another motion for leave to file another successive postconviction petition and restart the process of adjudicating his *Miller* claim.[5]

---

[5]The State has brought to our attention the recent Fourth District Appellate Court decision in *People v. Merriweather*, 2017 IL App (4th) 150407. *Merriweather* held that a juvenile defendant "forfeited his as-applied challenge to his sentence under *Miller* by raising it for the first time on appeal" and urged him to raise such a claim in a motion for leave to file a successive postconviction petition. *Id.* ¶¶ 18-19. The Fourth District departed from the First District decision in *People v. Nieto*, 2016 IL App (1st) 121604. *Nieto*, referencing an "implicit finding" in *Thompson*, stated that "juveniles can raise as-applied *Miller* challenges for the first time on appeal." *Id.* ¶ 39. *Merriweather* and *Nieto* both

¶ 33    The United States Constitution prohibits "cruel and unusual punishments." U.S. Const., amend. VIII. Inherent in that prohibition is the concept of proportionality. See *Graham*, 560 U.S. at 59. Criminal punishment should be "graduated and proportioned to both the offender and the offense." *Davis*, 2014 IL 115595, ¶ 18 (citing *Miller*, 567 U.S. at 469, 132 S. Ct. at 2463, and *Roper*, 543 U.S. at 560). When the offender is a juvenile and the offense is serious, there is a genuine risk of disproportionate punishment. In *Roper*, *Graham*, and *Miller*, the United States Supreme Court addressed that risk and unmistakably instructed that youth matters in sentencing. *Roper* held that the eighth amendment prohibited capital sentences for juveniles who commit murder. *Roper*, 543 U.S. at 578-79. *Graham* held that the eighth amendment prohibited mandatory life sentences for juveniles who commit nonhomicide offenses. *Graham*, 560 U.S. at 82. And *Miller* held that the eighth amendment prohibited mandatory life sentences for juveniles who commit murder. *Miller*, 567 U.S. at 489, 132 S. Ct. at 2475.

¶ 34    The defendant in this case did not receive a mandatory life sentence but rather a discretionary life sentence. Thus, we initially must decide whether his *Miller* claim is even viable. That is, we must decide whether *Miller* applies to discretionary life sentences. In *Davis*, we noted:

> "*Miller* holds that a *mandatory* life sentence for a juvenile violates the eighth amendment prohibition against cruel and unusual punishment. *** *Miller* does not invalidate the penalty of natural life without parole for multiple murderers, only its *mandatory* imposition on juveniles. [Citation.] A minor may still be sentenced to natural life imprisonment without parole so long as the sentence is at the trial court's discretion rather than mandatory." (Emphases in original.) *Davis*, 2014 IL 115595, ¶ 43.

*Davis* is correct about the scope of *Miller*. In *Davis*, however, we were not asked to decide whether *Miller* could apply to discretionary sentences. Further, we did not discuss *Miller* at length or address *Montgomery* at all because it had not yet been decided. We turn to those cases.

¶ 35    In *Miller*, the Court identified a foundational principle that "imposition of a State's most severe penalties on juvenile offenders cannot proceed as though they were not children." *Miller*, 567 U.S. at 474, 132 S. Ct. at 2466. That principle emerged from two lines of precedent: capital cases where the Court required the sentencer to consider the characteristics of the defendant and the circumstances of the offense before imposing the death penalty and so-called "categorical ban" cases, like *Roper* and *Graham*, where the Court invalidated certain sentences for all juvenile defendants. *Roper* and *Graham* established that "children are constitutionally different from adults for purposes of sentencing" in three important ways. *Id.* at 471, 132 S. Ct. at 2464. First, juveniles are more immature and irresponsible than adults. *Id.* (citing *Roper*, 543 U.S. at 569). Second, juveniles are more vulnerable to negative influences and pressures from family and peers than adults. *Id.* And third, juveniles are more malleable than adults—their characters are less fixed and their malfeasance is less indicative of

---

involved as-applied *Miller* claims challenging so-called mandatory *de facto* life sentences. Because that type of claim is not before us here, those cases are distinguishable. We leave for another day any resolution of the purported appellate court split.

irretrievable depravity. *Id.* Those differences lessen juveniles' moral culpability and enhance their prospects for reform. *Id.* at 472, 132 S. Ct. at 2465. Thus, the *Miller* Court summarized:

> "[T]he Eighth Amendment forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders. [Citation.] By making youth (and all that accompanies it) irrelevant to imposition of that harshest prison sentence, such a scheme poses too great a risk of disproportionate punishment." *Id.* at 479, 132 S. Ct. at 2469.

¶ 36    The Court noted, "Because that holding is sufficient to decide these cases, we do not consider [the petitioners'] alternative argument that the Eighth Amendment requires a categorical bar on life without parole for juveniles, or at least for those 14 and younger." *Id.* The Court continued, recognizing that life without parole sentences for juvenile defendants may comport with the eighth amendment:

> "[G]iven all we have said in *Roper*, *Graham*, and this decision about children's diminished culpability and heightened capacity for change, we think appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon. That is especially so because of the great difficulty we noted in *Roper* and *Graham* of distinguishing at this early age between 'the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption.' Although we do not foreclose a sentencer's ability to make that judgment in homicide cases, we require it to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." *Id.*

¶ 37    The Court reiterated that its decision "mandates only that a sentencer follow a certain process—considering an offender's youth and attendant characteristics—before imposing a particular penalty," life imprisonment without the possibility of parole. *Id.* at 483, 132 S. Ct. at 2471. Stated differently, a trial court must consider a juvenile's "age and age-related characteristics and the nature of their crimes" as "mitigating circumstances." *Id.* at 489, 132 S. Ct. at 2475. Earlier in its opinion, the Court discussed those characteristics:

> "[I]n imposing a State's harshest penalties, a sentencer misses too much if he treats every child as an adult. To recap: Mandatory life without parole for a juvenile precludes consideration of his chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences. It prevents taking into account the family and home environment that surrounds him—and from which he cannot usually extricate himself—no matter how brutal or dysfunctional. It neglects the circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressures may have affected him. Indeed, it ignores that he might have been charged and convicted of a lesser offense if not for incompetencies associated with youth—for example, his inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys. [Citations.] And finally, this mandatory punishment disregards the possibility of rehabilitation even when the circumstances most suggest it." *Id.* at 477-78, 132 S. Ct. at 2468.

¶ 38    *Miller* contains language that is significantly broader than its core holding. None of what the Court said is specific to only mandatory life sentences. *Montgomery* made that clear. In

*Montgomery*, the Court held that *Miller* applied retroactively. 577 U.S. at ___, 136 S. Ct. at 736. Because the defendant there had received a mandatory life sentence, which violated *Miller*, the Court reversed that sentence and remanded for further proceedings. In doing so, the Court offered insight into *Miller*. The *Montgomery* Court summarized *Miller* in several similar ways. The Court asserted that "*Miller* requires that before sentencing a juvenile to life without parole, the sentencing judge take into account 'how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison.' " *Id.* at ___, 136 S. Ct. at 733 (quoting *Miller*, 567 U.S. at 480, 132 S. Ct. at 2469). The Court repeated that "*Miller* requires a sentencer to consider a juvenile offender's youth and attendant characteristics before determining that life without parole is a proportionate sentence." *Id.* at ___, 136 S. Ct. at 734. According to the Court, "[a] hearing where 'youth and its attendant characteristics' are considered as sentencing factors is necessary to separate those juveniles who may be sentenced to life without parole from those who may not." *Id.* at ___, 136 S. Ct. at 735 (quoting *Miller*, 567 U.S. at 465, 132 S. Ct. at 2460).

¶ 39    Notably, unlike *Miller*, *Montgomery* did not specify which characteristics attend youth. The Court remained hesitant to create more procedural requirements for state trial courts, such as a requirement that courts make findings of fact regarding a juvenile's incorrigibility, before imposing a life sentence. *Id.* at ___, 136 S. Ct. at 735. The Court emphasized, however, that while "*Miller* did not impose a formal factfinding requirement[, that] does not leave States free to sentence a child whose crime reflects transient immaturity to life without parole." *Id.* Such a sentence is disproportionate under the eighth amendment. *Id.*

¶ 40    A handful of cases from other states have limited *Miller* and *Montgomery* to only mandatory life sentences. See *Foster v. State*, 754 S.E.2d 33, 37 (Ga. 2014); *Arredondo v. State*, 406 S.W.3d 300, 307 (Tex. App. 2013); see also *Jones v. Commonwealth*, 795 S.E.2d 705, 721 (Va. 2017) ("[b]oth cases addressed *mandatory* life sentences without possibility of parole" (emphasis in original)). Those cases give insufficient regard to the Supreme Court's far-reaching commentary about the diminished culpability of juvenile defendants, which is neither crime- nor sentence-specific. The greater weight of authority has concluded that *Miller* and *Montgomery* send an unequivocal message: Life sentences, whether mandatory or discretionary, for juvenile defendants are disproportionate and violate the eighth amendment, unless the trial court considers youth and its attendant characteristics. See, *e.g.*, *State v. Riley*, 110 A.3d 1205, 1216 (Conn. 2015) ("*Miller* does not stand solely for the proposition that the eighth amendment demands that the sentencer have discretion to impose a lesser punishment than life without parole on a juvenile homicide offender"); *Aiken v. Byars*, 765 S.E.2d 572, 576 (S.C. 2014) ("whether their sentence is mandatory or permissible, any juvenile offender who receives a sentence of life without the possibility of parole is entitled to the same constitutional protections afforded by the Eighth Amendment's guarantee against cruel and unusual punishment"). We agree with that conclusion and hold that *Miller* applies to discretionary sentences of life without parole for juvenile defendants. We must next decide what it means to apply *Miller*.

¶ 41    The defendant urges us to adopt the characteristics mentioned in *Miller*, which he terms the "*Miller* factors," and direct trial courts to use them when revisiting life sentences imposed on juvenile defendants before that case was decided. In response, the State acknowledges that *Miller* requires trial courts to consider the mitigating characteristics of youth. The State,

however, contends that, although the Court provided an illustrative list of some of those characteristics, it did not require consideration of any specific factors.

¶ 42    The appellate court observed that courts in other states have struggled with how to apply *Miller*. 2016 IL App (5th) 100587-B, ¶ 33 (quoting *Riley*, 110 A.3d at 1214 n.5). Some courts have read *Miller* narrowly, holding that trial courts must consider generally mitigating circumstances related to a juvenile defendant's youth. See, *e.g.*, *Ex Parte Henderson*, 144 So. 3d 1262, 1283 (Ala. 2013) ("the *Miller* Court did not delineate specifically which factors to use in sentencing a juvenile"); *Conley v. State*, 972 N.E.2d 864, 876 (Ind. 2012) (holding that the sentencing court in that case complied with the requirements of *Miller* by taking into account how juveniles are different from adults); *State v. Long*, 138 Ohio St. 3d 478, 2014-Ohio-849, 8 N.E.3d 890, ¶¶ 15-16 (stating that *Miller* "does not lay out the 'certain process' that trial judges should follow when sentencing juveniles" and that various factors "may prove helpful" but are not required).

¶ 43    Other courts have read *Miller* more broadly, holding that trial courts must consider specifically the characteristics mentioned by the Supreme Court. See, *e.g.*, *People v. Gutierrez*, 324 P.3d 245, 268-69 (Cal. 2014) ("*Miller* discussed a range of factors relevant to a sentencer's determination of whether a particular defendant" is irreparably corrupt); *Riley*, 110 A.3d at 1216 (quoting *Miller*'s list of characteristics); *State v. Null*, 836 N.W.2d 41, 74-76 (Iowa 2013) (listing factors and stating that *Miller* provided "clearer guidance on the considerations given in sentencing"); *State v. Fletcher*, 47,777, p. 10 (La. App. 2 Cir. 4/10/13); 112 So. 3d 1031 (remanding for "a more thorough review of the appropriate factors enunciated in *Miller*"); *State v. Hart*, 404 S.W.3d 232, 238 (Mo. 2013) (*en banc*) (holding that the juvenile defendant's life sentence was unconstitutional because "the sentence [must] consider whether this punishment is just and appropriate in light of [his] age, maturity and the other factors discussed in *Miller*"); *State v. Ali*, 855 N.W.2d 235, 256-57 (Minn. 2014) (stating that "mitigating circumstances might include, but are not limited to," the characteristics in *Miller*); *Parker v. State*, 2011-KA-01158-SCT (¶ 19) (Miss. 2013) (noting that *Miller* identified "several factors," then quoting Miller's list of characteristics); *Luna v. State*, 387 P.3d 956, 962 (Okla. 2016) (quoting *Miller* and labeling three of the listed characteristics "important youth-related considerations"); *Commonwealth v. Knox*, 50 A.3d 732, 745 (Pa. 2012) (stating that "although *Miller* did not delineate specifically what factors a sentencing court must consider, at a minimum it should consider" a paraphrased version of the listed characteristics); *Aiken*, 765 S.E.2d at 577 (quoting the factors listed in *Miller*); *Bear Cloud v. State*, 2013 WY 18, ¶ 42, 294 P.3d 36 (quoting the factors listed in *Miller* and stating that those factors are "not exhaustive"). As the California Supreme Court observed, "the emerging body of post-*Miller* case law" has held that a trial court must consider some variant of the *Miller* factors before imposing a life sentence without the possibility of parole. *Gutierrez*, 324 P.3d at 269.

¶ 44    We adopt the latter approach. Not only is that approach consistent with *People v. Reyes*, 2016 IL 119271, ¶ 3, where we referred to the characteristics listed in *Miller* as "mitigating factors," it is also consistent with our earlier case law. We have long held that age is not just a chronological fact but a multifaceted set of attributes that carry constitutional significance. See *People v. McWilliams*, 348 Ill. 333, 336 (1932) (stating that, in sentencing a juvenile defendant, the trial court "may search anywhere" for aggravation and mitigation evidence, including "the general moral character of the offender, his mentality, his habits, his social environments, his abnormal or subnormal tendencies, his age, his natural inclination or

aversion to commit crime, the stimuli which motive his conduct, and \*\*\* [his] life, family, occupation, and record"); *People v. Miller*, 202 Ill. 2d 328, 341 (2002) (holding that "a mandatory sentence of natural life in prison with no possibility of parole grossly distorts the factual realities of the case and does not accurately represent [the] personal culpability" of the 15-year-old defendant); *cf. People v. La Pointe*, 88 Ill. 2d 482, 497 (1981) ("[h]ighly relevant—if not essential—to [a sentencing judge's] selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics" (internal quotation marks omitted)).

¶ 45    Additionally, consideration of the *Miller* factors is consistent with section 5-4.5-105 of the Unified Code of Corrections, which now requires the trial court to consider factors taken from the Supreme Court's list. See 730 ILCS 5/5-4.5-105 (West 2016). Because *Miller* is retroactive (see *Montgomery*, 577 U.S. at ___, 136 S. Ct. at 736; *Davis*, 2014 IL 115595, ¶ 39), all juveniles, whether they were sentenced after the statutory amendment became effective on January 1, 2016, or before that, should receive the same treatment at sentencing. See *People v. Ortiz*, 2016 IL App (1st) 133294, ¶ 23.[6]

¶ 46    Under *Miller* and *Montgomery*, a juvenile defendant may be sentenced to life imprisonment without parole, but only if the trial court determines that the defendant's conduct showed irretrievable depravity, permanent incorrigibility, or irreparable corruption beyond the possibility of rehabilitation. The court may make that decision only after considering the defendant's youth and its attendant characteristics. Those characteristics include, but are not limited to, the following factors: (1) the juvenile defendant's chronological age at the time of the offense and any evidence of his particular immaturity, impetuosity, and failure to appreciate risks and consequences; (2) the juvenile defendant's family and home environment; (3) the juvenile defendant's degree of participation in the homicide and any evidence of familial or peer pressures that may have affected him; (4) the juvenile defendant's incompetence, including his inability to deal with police officers or prosecutors and his incapacity to assist his own attorneys; and (5) the juvenile defendant's prospects for rehabilitation. See *Miller*, 567 U.S. at 477-78, 132 S. Ct. at 2468.

¶ 47    For juvenile defendants like the defendant in this case, who were sentenced before the statutory amendment, any inquiry into the *Miller* factors is backwards-looking. As *Graham* instructed, "[e]ven if the State's judgment that [the defendant] was incorrigible were later corroborated by prison misbehavior or failure to mature, the sentence was still disproportionate because that judgment was made at the outset." *Graham*, 560 U.S. at 73. Bad conduct while imprisoned cannot buttress a finding of incorrigibility. Similarly, good conduct while imprisoned cannot undercut such a finding. In revisiting a juvenile defendant's life without parole sentence, the only evidence that matters is evidence of the defendant's youth and its attendant characteristics at the time of sentencing. Whether such evidence exists depends upon the state of the record in each case. A court revisiting a discretionary sentence of life without parole must look at the cold record to determine if the trial court considered such evidence at the defendant's original sentencing hearing. We must decide whether the trial court did so here.

---

[6]According to a recent report, there are 20 juveniles, including the defendant, serving discretionary life sentences in Illinois. See *A State-by-State Look at Juvenile Life Without Parole*, Associated Press, July 31, 2017, https://apnews.com/9debc3bdc7034ad2a68e62911fba0d85.

¶ 48    In announcing the defendant's sentence, the trial court explicitly stated that it considered the trial evidence and the PSI, as well as the evidence and arguments from the sentencing hearing. The trial court knew the defendant was 17 at the time of the offense, and the prosecutor and the defendant's attorney both highlighted his age in their arguments at the sentencing hearing. The PSI and the psychological reports provided some insight into his mentality but did not depict him as immature, impetuous, or unaware of risks. The PSI included information about the defendant's family. Although his father and his stepfather had died, he reportedly maintained a close relationship with his mother and siblings. The evidence at trial showed that there was some dispute between the defendant and Davis about who shot Esther, but both were intimately involved with the offense. The defendant's fingerprints were found in two locations at the house, including the cabinet where the rifle was kept. The PSI alerted the trial court to the defendant's susceptibility to peer pressure, as well as his low intelligence and possible brain damage from a head injury, but there was nothing presented at trial or sentencing to indicate that the defendant was incompetent and could not communicate with police officers or prosecutors or assist his own attorney. Dr. Raza's second report spoke positively about the defendant's verbal intelligence. As to the defendant's prospects for rehabilitation, the PSI included a statement from the probation officer, who found "no predilection for rehabilitation," in light of the defendant's "history of senseless criminal acts of mortal violence toward others and lack of remorse for his victims."

¶ 49    The defendant insists that the trial court did not, in fact, consider any mitigating circumstances of his youth because the trial court stated that it found "no mitigating factors." The defendant misapprehends the trial court's statement. The court actually said that it considered the statutory factors in aggravation and mitigation and that it found none of the latter. The trial court's statement is undeniably true. There was no evidence at trial or sentencing regarding any of the 12 factors listed in section 1005-5-3.1(a). See Ill. Rev. Stat. 1979, ch. 38, ¶ 1005-5-3.1(a). Further, the defendant forgets that he advised his attorney that he did not want to offer any mitigating evidence and his mother advised his attorney that she did not want to testify on his behalf. The defendant's attorney informed the court of their wishes and acknowledged, "I have no evidence to present at this time." And the defendant's attorney specifically declined the trial court's invitation to make any additions, corrections, or modifications to the PSI. In short, the defendant had every opportunity to present evidence to show that his criminal conduct was the product of immaturity and not incorrigibility. See *Montgomery*, 577 U.S. at ___, 136 S. Ct. at 736 (juveniles facing life sentences "must be given the opportunity to show their crime did not reflect irreparable corruption"). He chose to offer nothing.

¶ 50    Thus, the trial court had no evidence to consider on any of the statutory factors in mitigation, but some evidence related to the *Miller* factors. On the other side of the scale, the trial court had significant evidence to consider on the statutory factors in aggravation. See Ill. Rev. Stat. 1979, ch. 38, ¶ 1005-5-3.2. The defendant admits in his reply brief that "there are bad facts." That is an understatement. The trial court knew those facts, having presided over the case from pretrial motion hearings through the trial and the sentencing hearing. The court concluded that the defendant's conduct placed him beyond rehabilitation and sentenced him to life without parole. The defendant's sentence passes constitutional muster under *Miller*.

¶ 51    Finally, we note that *amicus* asks for a categorical ban on life sentences for juveniles. We refuse to adopt such a rule. Whether or not discretionary life sentences for juveniles are

- 14 -

advisable is a question for legislators. Whether or not such sentences are constitutional is a question for judges, and the justices of the United States Supreme Court have so far declared that they may be, provided the trial court complies with *Miller*. Even the defendant agrees that "[n]othing in this Court's jurisprudence or *Miller* held that a natural life sentence may *never* be appropriate."

¶ 52                                         CONCLUSION

¶ 53        For the reasons that we have stated, we affirm the appellate court's judgment, which affirmed the trial court's decision to deny the defendant's motion for leave to file a successive postconviction petition.

¶ 54        Affirmed.