# Illinois Official Reports

## Appellate Court

---

*People v. Reyes*, **2020 IL App (2d) 180237**

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ZACHARY REYES, Defendant-Appellant. |
| District & No. | Second District<br>No. 2-18-0237 |
| Filed | June 25, 2020 |
| Decision Under Review | Appeal from the Circuit Court of Kendall County, No. 09-CF-505; the Hon. Timothy J. McCann, Judge, presiding. |
| Judgment | Vacated and remanded. |
| Counsel on Appeal | James E. Chadd, Thomas A. Lilien, and Fletcher P. Hamill, of State Appellate Defender's Office, of Elgin, for appellant.<br><br>Eric C. Weiss, State's Attorney, of Yorkville (Patrick Delfino, Edward R. Psenicka, and Mary Beth Burns, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | JUSTICE SCHOSTOK delivered the judgment of the court, with opinion.<br>Justices McLaren and Bridges concurred in the judgment and opinion. |

**OPINION**

¶ 1        In 2012, following a jury trial, the juvenile defendant, Zachary Reyes, was convicted of one count of first degree murder (720 ILCS 5/9-1(a)(1), (a)(2) (West 2008)) and two counts of attempted murder with a firearm (720 ILCS 5/8-4(a), 9-1(a)(1) (West 2008)). The defendant was sentenced to 97 years' imprisonment. Our supreme court ultimately determined that the defendant's sentence was unconstitutional and remanded for a new sentencing hearing. *People v. Reyes*, 2016 IL 119271. On remand, the trial court sentenced the defendant to 66 years' imprisonment. The defendant appeals from this order. We vacate the defendant's sentence and remand to the trial court for resentencing.

¶ 2                                          I. BACKGROUND

¶ 3        The defendant was charged by indictment in the circuit court of Kendall County with the first degree murder of Jason Ventura and the attempted murders of Eduardo Gaytan and Jorge Ruiz. The indictment alleged that on December 20, 2009, defendant personally discharged a firearm in the direction of a vehicle occupied by Ventura, Gaytan, and Ruiz and that defendant's actions caused the death of Ventura as well as serious injury to Gaytan. The defendant, who was 16 years old at the time of the shootings, was prosecuted as an adult (see 705 ILCS 405/5-130(1)(a)(i) (West 2008)). Following a jury trial, he was found guilty of the charged offenses.

¶ 4        At the defendant's sentencing hearing, the trial court imposed the mandatory minimum sentence of 45 years' imprisonment for the first degree murder conviction, consisting of the minimum 20-year sentence for murder (see 730 ILCS 5/5-4.5-20(a) (West 2008)), plus the minimum 25-year mandatory firearm enhancement (see 730 ILCS 5/5-8-1(a)(1)(d)(iii) (West 2008)). The court also sentenced the defendant to 26 years' imprisonment for each of the two attempted-murder convictions, which consisted of the minimum 6-year sentence for attempted murder (see 730 ILCS 5/5-4.5-25(a) (West 2008)), plus the 20-year mandatory firearm enhancement (see 730 ILCS 5/5-8-1(a)(1)(d)(ii) (West 2008)). In addition, as required by statute (see 730 ILCS 5/5-8-4(d)(1) (West 2008)), the trial court ordered that all of the defendant's sentences must run consecutively to each other. As a result, the defendant was sentenced to a mandatory minimum aggregate sentence of 97 years' imprisonment. The defendant filed a timely notice of appeal from this sentence.

¶ 5        On appeal, the defendant argued, in part, that his sentence was unconstitutional pursuant to *Miller v. Alabama*, 567 U.S. 460 (2012). See *People v. Reyes*, 2015 IL App (2d) 120471, ¶ 16. The defendant acknowledged that *Miller* prohibited a sentencing scheme that mandated a sentence of natural life in prison without the possibility of parole for juvenile offenders. *Id.*; *Miller*, 567 U.S. at 479. The defendant argued, however, that his aggregate term-of-years sentence was a *de facto* mandatory natural life term of imprisonment and was likewise unconstitutional under *Miller*. *Reyes*, 2015 IL App (2d) 120471, ¶ 16. This court rejected defendant's argument and affirmed his sentence. *Id.* ¶ 23. We concluded that *Miller* applied only to actual sentences of life without the possibility of parole and thus declined to extend the *Miller* rationale to an aggregate term-of-years sentence that amounted to a *de facto* life term. *Id.* ¶¶ 23-25. Our supreme court subsequently granted the defendant's petition for leave to appeal. See Ill. S. Ct. R. 315 (eff. Jan. 1, 2015).

¶ 6 On review, our supreme court held that the defendant's term-of-years sentence was a mandatory, *de facto* life-without-parole sentence that was the functional equivalent of a life sentence without the possibility of parole. See *Reyes*, 2016 IL 119271, ¶ 9. The court concluded that the defendant's sentence constituted cruel and unusual punishment, in violation of the eighth amendment to the United States Constitution. *Id.* ¶ 10. The court thus vacated the defendant's sentence as unconstitutional pursuant to *Miller* (*id.*) and remanded the matter to the trial court for resentencing (*id.* ¶ 12). In so ruling, the court noted that, while the defendant's appeal was pending, the legislature enacted a new law, codified in section 5-4.5-105 of the Unified Code of Corrections (730 ILCS 5/5-4.5-105 (West Supp. 2015)), which provided a new sentencing scheme for juvenile defendants. The law requires trial courts to take into account several mitigating factors in determining appropriate sentences and makes the imposition of firearm enhancements a matter of discretion with the trial courts. *Reyes*, 2016 IL 119271, ¶ 11. The court held that the defendant should be resentenced in accordance with the new statute. *Id.* ¶ 12.

¶ 7 On remand, the trial court ordered a new presentence investigation (PSI) report and, at the defendant's request, an IQ test. In September 2017, a psychological evaluation was conducted at the Kane County Diagnostic Center, and a report was issued. The report indicated that the defendant received special education accommodations from 2002 to 2009. During that time, he suffered from attention deficit hyperactivity disorder (ADHD) and took medication for that condition. ADHD caused problems with inattention and impulsivity, but it is not classified as an intellectual disability. When the defendant took his medication, he showed marked progress in his academic functioning. However, the defendant stopped taking his medication when he was in seventh and eighth grades and exhibited behavioral issues as a result. In seventh grade, he was suspended for gang-related writing. On a General Ability Index (GAI) evaluation, which the report indicated "represent[ed] a reliable and valid estimate of his overall intellectual ability," the defendant scored in the tenth percentile, which indicated that he was in the low average range of functioning. The conclusion in the report was that the defendant did not meet the criteria for intellectual disability as defined by section 5-1-13 of the Unified Code of Corrections (730 ILCS 5/5-1-13 (West 2016)).

¶ 8 The record indicates that, while an initial PSI report was completed in March 2012, the updated PSI report was completed on November 8, 2017. The PSI report indicated that, prior to the charges in this case, the defendant's juvenile record consisted of a charge of unlawful possession of a firearm without a valid firearm owner's identification card. At the time of his arrest, he was in the ninth grade at East Aurora High School. Since he was incarcerated, he had taken classes and earned numerous certificates in roofing, insulation, and vinyl decking. He had also earned an anti-violence-awareness certificate and had attended Bible study classes. The report indicated that his parents never married and his father did not play an active role in his life. He grew up at home with his mother and four half-siblings. He described his relationship with his half-siblings as "good." The defendant became involved with the Latin Kings street gang when he was 13 or 14 years old. The defendant expressed remorse for his offenses and specifically for the death of Ventura.

¶ 9 The PSI report further indicated that a "Level of Service Inventory-Revised (LSI-R)" was completed for the defendant and that the test was an objective and quantifiable risk-assessment tool for predicting current risk to reoffend. Defendant's LSI-R was based on the factors and details that were relevant to him at the time of the offenses, December 20, 2009. The results

showed that the defendant was a medium risk for recidivism at the time of the offenses. The report also indicated that, at the time of his arrest, the defendant was on probation for his charge of unlawful possession of a weapon. The report concluded that the defendant's subsequent arrest for the crimes at issue indicated that his attitude was "supportive of crime."

¶ 10 An addendum to the PSI report was filed, which included a written statement from the defendant. In that statement, the defendant expressed remorse for the crimes at issue and stated that he took full responsibility for his actions. He stated that, while incarcerated, he had been taking classes because he wanted to learn and become a better person. On the night of the shooting, older members of the Latin Kings had taken advantage of him because he wanted to be liked, had low self-esteem, and did not know how to refuse them when they asked him to shoot.

¶ 11 On February 16, 2018, at the sentencing hearing, the State submitted two disciplinary reports for the defendant from the Menard Correctional Center, dated July 27, 2012, and May 23, 2014. Both disciplinary reports were for possession of contraband: one for having a weapon (a piece of metal that had a hook on one end) and one for literature related to the Latin Kings (the Latin Kings "Holy Prayer" and "Code of Kingdom"). The State also submitted an April 19, 2016, affidavit from the defendant, which had been filed in a Kendall County case against his codefendant, Francisco Salazar. In the affidavit, the defendant admitted to receiving the gun used in the shooting from higher ranking members of the Latin Kings and firing all the shots into Ventura's car, based on orders from the higher-ranking gang members. The defendant also claimed that Salazar was not aware of the gun or the plan. This differed from the defendant's testimony at his own trial, where he had testified that he was not the one who fired the shots towards Ventura's car.

¶ 12 The defendant submitted his school records, which showed that he had an Individual Education Program (IEP) and was in the ninth grade at age 16. The defendant's mother testified that the defendant had an IEP since first grade. He was ultimately diagnosed with ADHD. The defendant always scored below average and was considered learning disabled. The defendant struggled socially and did not have many friends. The defendant's mother testified that the other people involved in the crime were not people with whom the defendant normally associated. On cross-examination, the defendant's mother acknowledged that the defendant's problems in school were also related to his behavior and that his behavior problems were the main reason he was placed in special schools. She was not aware that the defendant's IEP reports indicated that he had gang affiliations as early as 2007.

¶ 13 The trial court heard victim impact statements from Ventura's mother, father, and brother. The trial court then heard arguments. The State noted that one of the factors to consider in mitigation was whether the defendant's criminal conduct was a result of circumstances unlikely to recur. The State noted that the May 2014 disciplinary report from the correctional center indicated that the defendant had a copy of the Latin Kings' "Holy Prayer" and "Code of Kingdom." The State argued that the defendant's continued gang affiliation showed that the defendant's criminal conduct was likely to recur. The State also argued that the defendant was not a candidate for rehabilitation. The State noted that the defendant was still part of the gang and still did not take responsibility for his actions. The State pointed out that, at his trial, the defendant testified that he was not the shooter and that, in a subsequent affidavit, he stated that he was the shooter. Either way, the State argued, the defendant continued to blame others and not truly accept responsibility for his actions.

¶ 14       The defendant argued that he did not have a violent criminal history. His only other offense prior to the murder was possessing a gun that he had found. The defendant argued that he was taken advantage of by the older gang members. He had a learning disability and was not a mature 16-year-old. The crime was the result of peer pressure and negative influences. The defendant argued that he had a high potential for rehabilitation, as evidenced by the multiple classes he was taking in prison to better himself. The defendant argued that the event was not planned and that he had expressed remorse for his actions. With regard to his two disciplinary reports—for having a piece of metal that could be used as a weapon and for gang affiliation—defendant argued that such actions were a means of survival for a juvenile defendant sent to a maximum-security prison. Defendant noted that he was 5'7" tall and weighed 145 pounds.

¶ 15       On March 16, 2018, the trial court announced its ruling. The trial court noted that it reviewed the transcripts of the jury trial and the original sentencing hearing. The trial court stated that it considered all the evidence presented at the sentencing hearing, including the testimony, the victim impact statements, and the PSI report and the addendum. The trial court further stated that it considered the nature of the offense, the maximum and minimum sentences, the defendant's criminal history, the crime's impact on society, the defendant's young age, his familial and home environment, the extent of his participation in the crimes, the effect of peer pressure, and the possibility of the defendant's rehabilitation.

¶ 16       The trial court stated that it considered the statutory factors in aggravation and mitigation. In mitigation, the trial court found that the defendant acted under strong provocation and that he had an intellectual disability. In aggravation, the trial court considered that the defendant had a prior weapons-related offense and that the current offense was gang-related. The trial court noted that it also considered that the appropriate sentence should be a deterrent to others but that it did not give this factor significant weight. Finally, the trial court stated that it considered the two disciplinary reports to the extent that they related to the defendant's potential for rehabilitation.

¶ 17       The trial court sentenced the defendant to 25 years' imprisonment and a 25-year firearm enhancement for the first degree murder of Ventura, 10 years' imprisonment for the attempted murder of Gaytan, and 6 years' imprisonment for the attempted murder of Ruiz. As required by statute, the trial court ordered the sentences to run consecutively, resulting in an aggregate prison term of 66 years. The trial court calculated that the defendant would be eligible for parole after 63.5 years, at the age of 82. Thereafter, the defendant filed a timely notice of appeal.

¶ 18                                                          II. ANALYSIS

¶ 19       On appeal, the defendant argues that the trial court abused its discretion in sentencing him to a 66-year *de facto* natural life aggregate sentence without adequately considering the defendant's youth and attendant circumstances. The defendant's challenge to his sentence is based on *Miller*, 567 U.S. 460, and the line of cases following that decision.

¶ 20       The defendant acknowledges that the issue is forfeited because he did not file a motion to reconsider his sentence in the trial court. *People v. Hillier*, 237 Ill. 2d 539, 544 (2010) ("to preserve a claim of sentencing error, both a contemporaneous objection and a written postsentencing motion raising the issue are required"). However, in an effort to promote judicial economy, the State has waived any claim that the argument is forfeited and has requested that we address the merits of the appeal. *People v. Beachem*, 229 Ill. 2d 237, 241 n.2

(2008) (forfeiture is in the nature of an affirmative defense that State may raise, waive, or forfeit).

¶ 21    In *Miller*, the Court held "that the [e]ighth [a]mendment forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders" who commit murder. *Miller*, 567 U.S. at 479. *Miller* did not preclude a sentence of life without parole for homicide offenders; it required only that the trial court first consider the special characteristics of young offenders, such as immaturity, impetuosity, and the failure to appreciate risks and consequences, before imposing such a sentence on them. *Id.* at 477. In other words, the Court's holding required that life-without-parole sentences be based on judicial discretion, rather than statutory mandates. *Id.* at 479.

¶ 22    The Court later clarified *Miller*'s holding in *Montgomery v. Louisiana*, 577 U.S. ___, 136 S. Ct. 718 (2016). *Montgomery* reinforced that children are constitutionally different from adults for sentencing purposes. *Id.* at ___, 136 S. Ct. at 733. The Court noted that, under *Miller*, sentencing a child to life without parole is excessive for all but " 'the rare juvenile offender whose crime reflects irreparable corruption.' " (Internal quotation marks omitted.) *Id.* at ___, 136 S. Ct. at 734 (quoting *Miller*, 567 U.S. at 479-80). *Montgomery* explained that, in *Miller*, "[t]he Court recognized that a [trial court] might encounter the rare juvenile offender who exhibits such irretrievable depravity that rehabilitation is impossible and life without parole is justified. But in light of 'children's diminished culpability and heightened capacity for change,' *Miller* made clear that 'appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon.' " *Id.* at ___, 136 S. Ct. at 733-34 (quoting *Miller*, 567 U.S. at 479). The Court held that *Miller*'s holding was retroactive. *Id.* at ___, 136 S. Ct. at 736; see also *People v. Davis*, 2014 IL 115595, ¶ 39 (same).

¶ 23    Our supreme court has extended the *Miller* rationale, holding that (1) *Miller* applies to a mandatory term-of-years sentence that is the functional equivalent of life without the possibility of parole (a *de facto* life sentence) (*Reyes*, 2016 IL 119271, ¶¶ 9-10) and (2) *Miller* applies to discretionary sentences of life without parole for juvenile defendants (*People v. Holman*, 2017 IL 120655, ¶ 40). More recently, the court has defined a *de facto* life sentence for a juvenile offender as one that is greater than 40 years. *People v. Buffer*, 2019 IL 122327, ¶¶ 41-42 (stating "a prison sentence of 40 years or less imposed on a juvenile offender does not constitute a *de facto* life sentence in violation of the eighth amendment").

¶ 24    In *Buffer*, our supreme court held that, "to prevail on a claim based on *Miller* and its progeny, a defendant sentenced for an offense committed while a juvenile must show that (1) the defendant was subject to a life sentence, mandatory or discretionary, natural or *de facto*, and (2) the sentencing court failed to consider youth and its attendant characteristics in imposing the sentence." *Id.* ¶ 27 (citing *Holman*, 2017 IL 120655, ¶ 40, and *Reyes*, 2016 IL 119271, ¶ 9). In the present case, the defendant's 66-year sentence is a discretionary *de facto* life sentence, and *Miller* thus applies. *Id.*

¶ 25    In *Holman*, the court explained:

> "Under *Miller* and *Montgomery*, a juvenile defendant may be sentenced to life imprisonment without parole, but only if the trial court determines that the defendant's conduct showed irretrievable depravity, permanent incorrigibility, or irreparable corruption beyond the possibility of rehabilitation. The court may make that decision only after considering the defendant's youth and its attendant characteristics. Those characteristics include, but are not limited to, the following factors [((the *Miller*

factors)]: (1) the juvenile defendant's chronological age at the time of the offense and any evidence of his particular immaturity, impetuosity, and failure to appreciate risks and consequences; (2) the juvenile defendant's family and home environment; (3) the juvenile defendant's degree of participation in the homicide and any evidence of familial or peer pressures that may have affected him; (4) the juvenile defendant's incompetence, including his inability to deal with police officers or prosecutors and his incapacity to assist his own attorneys; and (5) the juvenile defendant's prospects for rehabilitation." *Holman*, 2017 IL 120655, ¶ 46 (citing *Miller*, 567 U.S. at 477-78).

Accordingly, to withstand a *Miller*-based constitutional challenge to a defendant's sentence, the trial court must consider the *Miller* factors and determine whether the defendant was among those juvenile offenders whose conduct reflects transient immaturity or whether the defendant was among the rarest of juvenile offenders whose conduct places him beyond the possibility of rehabilitation. *Id.*

¶ 26    In the present case, the trial court stated that it considered the *Miller* factors. Specifically, it considered "the defendant's age, his family and home environment, the extent of his participation in the crimes, the effect of any familial or peer pressure, and the possibility of his rehabilitation." Further, some information pertinent to the *Miller* factors was presented and considered through the defendant's school records, the PSI report and the addendum, the evidence presented at the sentencing hearing, and the parties' arguments.

¶ 27    Regarding the first *Miller* factor, the trial court stated that it considered that the defendant was only 16 years old at the time of the offenses. The trial court also considered, as a statutory mitigating factor, that the defendant had an intellectual disability. The record indicates that the defendant struggled in school and, at the time of the offenses, although he was 16 years old, he was only in the ninth grade.

¶ 28    As to the second *Miller* factor, the PSI report indicated that the defendant grew up without a father but had a seemingly normal home life with his mother and four half-siblings. In the PSI report, the defendant described his relationship with his siblings as "good." The report also indicated that his mother and half-siblings had visited him while he was incarcerated.

¶ 29    With regard to the third factor, the defendant's degree of participation in the crimes, the jury found that the defendant had fired the shots that killed Ventura, and in a subsequent affidavit, the defendant admitted that, at the request of a higher-ranking gang member, he was the one who fired the shots at Ventura's vehicle. The trial court considered, in mitigation, that the defendant likely acted under strong provocation from others. Regarding the fourth factor, there was no evidence presented that the defendant was unable to deal with the police officers or prosecutors or was incapable of assisting his own attorneys.

¶ 30    Finally, with regard to the fifth factor, the defendant's potential for rehabilitation, the trial court stated generally that it considered the issue of rehabilitation and that it considered the defendant's two disciplinary reports as they related to the defendant's potential for rehabilitation. The record also shows that the trial court considered that the defendant had one previous juvenile offense of record for unlawful possession of a weapon. The State argued that the defendant was not amenable to rehabilitation, as evidenced by his two disciplinary reports and continued gang affiliation. The defendant argued that the continued gang affiliation was merely a method of survival for a juvenile in a maximum-security prison and that he had potential for rehabilitation, as demonstrated by his expressed remorse and the classes he attended while incarcerated.

¶ 31 Accordingly, the record shows that the trial court stated that it considered the *Miller* factors and that there was also evidence and argument related to those factors. However, despite noting the defendant's age, the trial court never commented on the defendant's immaturity, impetuosity, or ability to understand risks and consequences. The trial court did not specifically address whether the defendant was too young or too immature to resist the negative influences surrounding him at the time or whether he was mature enough to maintain control over his actions. With respect to rehabilitation, the trial court did not mention or discuss the finding in the PSI report that the defendant was at a medium risk to reoffend. The trial court also did not comment on the fact that the defendant had earned a number of certificates in prison as a means to better himself and had expressed remorse in his written statement. As such, the record does not show that the trial court made any determination that the defendant was beyond rehabilitation or that the defendant's conduct reflected permanent incorrigibility. *Cf. Holman*, 2017 IL 120655, ¶¶ 48, 50 (the defendant's sentence complied with *Miller* where the probation officer, in the PSI report, stated that the defendant had "no predilection for rehabilitation" and the trial court found that the defendant could not be rehabilitated).

¶ 32 Based on our review of the record, we hold that the defendant's sentence did not comply with *Miller* and *Holman*. In this case, the trial court imposed a *de facto* life sentence on the defendant, but the record does not reflect a determination by the trial court that the defendant was among the rarest of juvenile offenders whose "conduct showed irretrievable depravity, permanent incorrigibility, or irreparable corruption beyond the possibility of rehabilitation." *Id.* ¶ 46. Accordingly, the appropriate remedy is to vacate the defendant's sentence and remand for resentencing. *Davis*, 2014 IL 115595, ¶ 43. In so ruling, we express no view about the sentence that the defendant should ultimately receive. On remand, the trial court could once again impose a *de facto* life sentence *only* if it determines that the defendant is beyond rehabilitation. See *Holman*, 2017 IL 120655, ¶ 46.

¶ 33                                               III. CONCLUSION

¶ 34 For the reasons stated, we vacate the defendant's sentence and remand for a new sentencing hearing.

¶ 35 Vacated and remanded.