NOTICE
This Order was filed under
Supreme Court Rule 23 and
is not precedent except in the
limited circumstances
allowed under Rule 23(e)(1).

2021 IL App (4th) 190656-U

NO. 4-19-0656

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
June 1, 2021
Carla Bender
4th District Appellate
Court, IL

| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Macon County |
| BRANDON D. OWENS, | ) | No. 08CF1345 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Jeffrey S. Geisler, |
| | ) | Judge Presiding. |

_____

JUSTICE HOLDER WHITE delivered the judgment of the court.
Presiding Justice Knecht and Justice Turner concurred in the judgment.

**ORDER**

¶ 1     *Held*:   The appellate court affirmed, concluding the trial court did not err by dismissing
defendant's postconviction petition at the second stage because defendant's
claims were forfeited where he failed to raise the claims on direct appeal.

¶ 2     In June 2018, defendant, Brandon D. Owens, filed a postconviction petition.  In

April 2019, counsel for defendant filed an amended postconviction petition alleging ineffective

assistance of trial counsel where counsel (1) failed to take various steps upon being informed of a

sleeping juror and (2) became so ill during the trial that she advised the trial court she needed

medical attention.  In May 2019, the State filed a motion to dismiss defendant's postconviction

petition at the second stage of proceedings.  In September 2019, the court dismissed defendant's

postconviction petition.

¶ 3    Defendant appeals, arguing the trial court erred by dismissing defendant's postconviction petition at the second stage. For the following reasons, we affirm the trial court's judgment.

¶ 4                                    I. BACKGROUND

¶ 5                                       A. Trial

¶ 6    In September 2008, the State charged defendant with six counts of first degree murder. On direct appeal, this court summarized the evidence presented at trial as follows:

> "On September 7, 2008, Cunningham was found dead in her home. She had last been seen alive the night before. Cunningham's cousin lived across the street and testified she saw Cunningham the night of September 6, 2008, counting a large quantity of money. Cunningham died from approximately 70 stab and 'cutting' wounds. The number of wounds, their locations, and defensive wounds indicated Cunningham had resisted her attacker. The police investigation led to defendant as a suspect.
>
>      Defendant's sister, Shaquila Clark, testified she purchased a pair of black jeans for defendant, which he wore in the early morning hours of September 7, 2008, at a club in Springfield. Clark, defendant, and a number of other Decatur residents left the Springfield club after it closed and stopped at a gas station in Decatur. Clark and defendant returned to her home, where defendant usually stayed, around 4 a.m. on September 7, 2008. Clark immediately fell asleep, but she testified defendant was there

when she woke up sometime between 9 a.m. and 11 a.m. The black jeans Clark purchased for defendant were found doused in bleach in a bag in an unlocked garage behind Clark's house. Blood found on the jeans was a match for Cunningham's deoxyribonucleic acid (DNA). A pair of boxers was also recovered from the bag and blood found on the boxers had a mixture of Cunningham's DNA and defendant's DNA.

A latent print examiner testified a bloody fingerprint found on Cunningham's oven door matched defendant's right middle finger. According to the print examiner, a print on the edge of the oven door matched defendant's right palm.

The State played recorded interviews for the jury. When speaking to police, defendant denied any involvement in Cunningham's death. Defendant had a large amount of currency on him at the time of his arrest and told police officers he was a saver.

Defendant had numerous cuts on his right hand and he told police he was right handed. Defendant explained some of the cuts happened when he broke a plate in anger and he could not explain the rest of the cuts. A pathologist testified Cunningham's attacker could have had hand injuries because blood could make a knife slippery. According to the pathologist, photographs of defendant's

cuts depicted 'healing sharp' injuries." *People v. Owens*, 2017 IL App (4th) 150378-U, ¶¶ 7-11.

¶ 7  Following a lunch break during the State's case-in-chief, the trial court held a brief hearing outside the presence of the jury. The court stated defense counsel was "under the weather." The court noted defense counsel "might need some medical attention," and it continued the trial to the following day. The next day, the trial court sought to supplement the record and noted the previous afternoon defense counsel experienced health difficulties and wanted to seek medical attention. The court noted the parties agreed to set the case over to the next day. The judge stated, "And then something happened yesterday afternoon, which quite frankly I'm not quite sure about. A communication that [defense counsel] was going to get admitted to the hospital only if the Court would agree not to grant a mistrial." The prosecutor confirmed she had that conversation with defense counsel and contacted the trial court's clerk. The judge said, "We need to make it clear for the record. First of all, if [defense counsel] is having a medical difficulty, she should seek medical treatment. The Court will not stand in her way whatsoever. If she feels she can't complete as counsel, she needs to tell the Court and she needs to get medical treatment. There won't be any[ ]more phone conversations. This case also will all be on the record from this point forward." The court returned the jury to the courtroom, and the State finished presenting its evidence.

¶ 8  After the State rested, defendant chose to exercise his right to testify, and this court summarized his testimony as follows:

> "Defendant testified he and Cunningham shared a relative of
> Cunningham's as a drug supplier. Although defendant and
> Cunningham did not pool their money to purchase drugs, they

would get together to receive deliveries and pay Cunningham's relative for the drugs. Defendant testified he and Cunningham sold drugs from her house, although he also drove around to make sales. Sometimes defendant would leave drugs or money with Cunningham, which she stored behind her stove.

On September 6, 2008, defendant went to pick up some pills at another stash house he and Cunningham used, and Cunningham showed up in a truck with Toby Britton. Later that evening, defendant, his sister, and a few others went to a club in Springfield. They left the club around 3 a.m. on September 7, 2008, and met up with a few others at a gas station in Decatur. Defendant and some others went to his sister's house, where defendant got his sister's car keys to give some people rides." *Id.* ¶¶ 12-13.

¶ 9 At this point in the proceedings, the trial court interrupted defendant's testimony because it observed a juror who appeared to be sleeping. The following exchange occurred outside the presence of the jury:

"THE COURT: Did counsel make any observations about any of the jurors?

MS. KURTZ [(ASSISTANT STATE'S ATTORNEY)]: Judge, I—when the—earlier I did see one of the jurors—[another prosecutor] pointed it out to me—she had her head down or she was slouched back. She had her head tilted. When I looked over,

she did open her eyes and sit up. Although I wasn't paying attention again, but when the [c]ourt started to say we were going to take a break, I did look over again wondering if that was the issue and the same juror did have—was slouched down with her head to the side and her eyes were closed.

THE COURT: And that comports with the [c]ourt's observations. It's Ms. Brown. Sometimes people look down when they're listening. I have seen that happen, but I'm pretty sure that wasn't the case here with Ms. Brown. I'm bringing it to the counsel's attention. I don't know what you want to do anything about it or just—I'll take your suggestions.

Ms. Kurtz?

MS. KURTZ: I—I guess I can say I'm not sure how much—I wasn't looking at her enough to know was she sleeping the entire time or nodding off the entire time. I don't know what counsel wants to do or what the [c]ourt thinks is best whether or not it's good to have a conversation with her or dismiss her outright, I guess, I'm sorry, I didn't—those are—

THE COURT: Sure. Well, I think in these situations the best thing to do is either excuse her and put in an alternate or continue with her. But I don't think—it reached the point where I feel I had to tell counsel in case—I wasn't sure you knew or not.

MS. KURTZ: I had not seen it. I'm sorry. I was trying to take notes of the defendant except for the two times I described. I would have no objection to replacing her with an alternate.

THE COURT: What's your preference, Ms. Root [(defense attorney)]?

MS. ROOT: Well, we are very close to the end, Judge. I did not notice it. I have looked over a couple of times this morning, and she was observant when—at least when I was interviewing—or when I was questioning other witnesses. And I looked at her so I'm fine with—let's keep her and continue on.

THE COURT: Very well. And that's what we'll do. We might as well go ahead and take a little break, just maybe about ten minutes, let's resume then."

¶ 10    This court summarized the remaining evidence introduced at trial as follows:

"Defendant resumed his testimony, and testified Britton called him while he was still at the gas station in Decatur. According to defendant, Britton wanted to purchase ecstasy and defendant arranged to meet him. Eventually, defendant took his sister's car, gave a friend a ride, and then drove to Cunningham's house to meet Britton.

When he arrived, defendant saw the truck Cunningham and Britton were in earlier parked in the driveway. Defendant testified Cunningham's front door was open. When he opened the screen

- 7 -

door, an unknown man with his face covered pulled defendant inside. According to defendant, Cunningham was wearing only a bra and knelt in the middle of the living room with her hands up. Britton was there and had a bandana partially covering his face. Britton and the unknown man forced defendant to his knees and told him to remove his clothes. The two men repeatedly asked for the 'shit,' and defendant and Cunningham told them they did not have anything.

The unknown man went to the kitchen and returned with a knife, threatening to make defendant and Cunningham talk. The man again asked about the 'shit' and, when defendant again denied having anything, the man stabbed Cunningham. Defendant testified he was scared, knew there was money in the house, and told Cunningham to give the men the 'shit.' Cunningham was moaning and the unknown man stabbed her again, so defendant grabbed her.

Defendant testified Britton asked him about the stove, and defendant felt he had been set up. The men told defendant to move the stove, so he walked on his knees into the kitchen. Defendant tried to move the stove by the handle on the oven door, but the door started to come off. Britton and the unknown man looked behind the stove and found nothing there. The unknown man returned to the living room and defendant followed on his knees.

According to defendant, he offered to take the two men to get money. Britton and defendant got into the truck in the driveway, leaving the unknown man behind. Defendant gave Britton various directions, and defendant jumped from the vehicle when Britton came to a stop. Defendant testified he ran for approximately 10 minutes before he arrived at his sister's house. Defendant got some money and a gun from his sister's house and called a friend for a ride back to Cunningham's house. When he got to Cunningham's house, she was unresponsive on the floor, so defendant retrieved his sister's car and went back to her house.

Defendant did not tell anyone what happened that night because he was 'trying to piece stuff together' to figure out what exactly happened. Defendant testified he eventually told Detective Williams to look into Britton's involvement with Cunningham's death. According to defendant, he did not trust the police and wanted to hide that he was a drug dealer. Defendant testified he decided to piece together what happened that night himself and 'whatever happened, happened.'

Following closing arguments and deliberation, the jury returned a guilty verdict, finding defendant guilty of first degree murder." *Id.* ¶¶ 15-21.

In April 2015, the trial court sentenced defendant to 60 years' imprisonment.

¶ 11                           B. Direct Appeal

- 9 -

¶ 12    Defendant filed a direct appeal, arguing (1) he was denied the right to an impartial jury where the trial court did not remove or question a juror who slept during the trial; (2) a new sentencing hearing was necessary because the trial court improperly considered hearsay evidence regarding an uncharged home invasion in aggravation; and (3) the court should vacate certain void fines improperly imposed by the circuit clerk. In part, this court affirmed, concluding defendant was not denied his constitutional right to an impartial jury and, therefore, the trial court did not abuse its discretion in declining to remove or question a juror who slept during the trial.

¶ 13                            C. Postconviction Petition

¶ 14    In June 2018, defendant filed a postconviction petition. In April 2019, counsel for defendant filed an amended postconviction petition alleging ineffective assistance of trial counsel where (1) the trial court brought the sleeping juror to the parties' attention and defense counsel failed to (a) request that the court reopen *voir dire* to determine how much the juror missed, (b) ask that the sleeping juror be replaced with an alternate, (c) ask for a mistrial, and (d) consult with defendant about how he wished to proceed and (2) defense counsel became so ill during the trial that she advised the trial court she needed medical attention. In May 2019, the State filed a motion to dismiss defendant's postconviction petition at the second stage of proceedings.

¶ 15    In September 2019, the court dismissed defendant's postconviction petition.

¶ 16    This appeal followed.

¶ 17                            II. ANALYSIS

¶ 18    On appeal, defendant argues the trial court erred by dismissing defendant's postconviction petition at the second stage because his postconviction petition made a substantial

showing that he was denied the effective assistance of counsel. The State contends defendant's claims are forfeited because appellate counsel failed to raise the issues on direct appeal. The State further argues defendant cannot demonstrate prejudice.

¶ 19    The Post-Conviction Hearing Act (Postconviction Act) (725 ILCS 5/122-1 to 122-7 (West 2018)) provides a collateral means for a defendant to challenge a conviction or sentence for a violation of a federal or state constitutional right. *People v. Jones*, 211 Ill. 2d 140, 143, 809 N.E.2d 1233, 1236 (2004). Postconviction proceedings "focus on constitutional claims that have not and could not have been previously adjudicated." *People v. Holman*, 2017 IL 120655, ¶ 25, 91 N.E.3d 849. At the second stage of proceedings, defendant is entitled to appointed counsel who may amend the petition, and the State may file a motion to dismiss. *People v. Edwards*, 197 Ill. 2d 239, 245-46, 757 N.E.2d 442, 446 (2001). The trial court must determine whether the petition set forth a substantial showing of a constitutional violation. *Id.* at 246. "[T]he 'substantial showing' of a constitutional violation that must be made at the second stage [citation] is a measure of the legal sufficiency of the petition's well-pled allegations of a constitutional violation, *which if proven* at an evidentiary hearing, would entitle petitioner to relief." (Emphasis in original.) *People v. Domagala*, 2013 IL 113688, ¶ 35, 987 N.E.2d 767. Dismissal at the second stage "is warranted only when the allegations in the petition, liberally construed in light of the trial record, fail to make a substantial showing of a constitutional violation." *People v. Ryburn*, 2019 IL App (4th) 170779, ¶ 22, 134 N.E.3d 348. We review *de novo* the dismissal of a postconviction petition at the second stage of proceedings. *Id.*

¶ 20    Here, the record was developed as to the allegedly inattentive juror and as to counsel's illness. Accordingly, defendant could have raised his claims of ineffective assistance of counsel on direct appeal. "[I]ssues that could have been raised [on direct appeal], but were

- 11 -

not, are forfeited." *Holman*, 2017 IL 120655, ¶ 25. Indeed, defendant argued on direct appeal he was denied his constitutional right to an impartial jury where the trial court declined to remove or question the allegedly sleeping juror. This court rejected defendant's claim on direct appeal because the trial court immediately addressed the issue of the sleeping juror and "the problem did not persist through defendant's account of the events immediately surrounding Cunningham's death and we do not think defendant's account of the rides he gave various friends earlier in the evening constitutes 'significant testimony' the juror might have missed." *Owens*, 2017 IL App (4th) 150378-U, ¶ 40.

¶ 21        Defendant attempts to evade the forfeiture of these claims by arguing (1) appellate counsel was ineffective for failing to raise these claims on direct appeal and (2) defendant's affidavit regarding counsel's illness was not a matter of record for direct appeal purposes.

¶ 22        A claim of ineffective assistance of counsel is governed by the familiar framework set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). "To prevail on a claim of ineffective assistance of counsel, a defendant must demonstrate that counsel's performance was deficient and that the deficient performance prejudiced the defendant." *Domagala*, 2013 IL 113688, ¶ 36. The deficient-performance prong requires a defendant to show that counsel's performance was objectively unreasonable under prevailing professional norms. *People v. Veach*, 2017 IL 120649, ¶ 30, 89 N.E.3d 366. Under the prejudice prong, defendant must show a reasonable probability that but for counsel's deficient performance the outcome of the proceeding would have been different. *Id.* "A reasonable probability is defined as a probability sufficient to undermine confidence in the outcome." (Internal quotation marks omitted.) *Id.* A defendant must satisfy both prongs to prevail on a claim of ineffective assistance of counsel. *Id.*

¶ 23         We conclude defendant has failed to demonstrate his direct appeal had a reasonable probability of success had appellate counsel raised these issues. As noted above, this court concluded the juror did not miss significant testimony and the brief lapse in attention did not deny defendant an impartial jury. As such, defendant was not prejudiced by appellate counsel's failure to raise these issues because the juror's alleged inattentiveness did not affect the outcome of the trial. Accordingly, defendant has failed to demonstrate his appeal would have been successful but for appellate counsel's failure to raise this issue on direct appeal.

¶ 24         Moreover, our review of the record shows counsel's illness was raised before the trial court and could have been raised on direct appeal. Defendant's factual assertion in his affidavit that counsel's illness made it difficult for her to keep her attention on the trial is belied by the record. The record demonstrates defense counsel vigorously cross-examined the State's witnesses and zealously represented defendant by raising objections and making argument before the jury. Additionally, the trial court addressed counsel's illness on the record to ensure defense counsel was ready and able to represent defendant.

¶ 25         For the foregoing reasons, we conclude defendant's postconviction claims are forfeited because they could have been, but were not, raised on direct appeal. Moreover, even if counsel were ineffective for failing to raise these issues on direct appeal, defendant has failed to demonstrate a reasonable probability of success on direct appeal had counsel raised these issues. We therefore find the trial court did not err in dismissing defendant's postconviction petition at the second stage of proceedings, and we affirm the trial court's judgment.

¶ 26                              III. CONCLUSION

¶ 27         For the reasons stated, we affirm the trial court's judgment.

¶ 28         Affirmed.

- 13 -