2023 IL App (2d) 210423
No. 2-21-0423
Opinion filed March 22, 2023

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kendall County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 09-CF-505 |
| ZACHARY REYES, | ) ) ) | Honorable Robert P. Pilmer, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE SCHOSTOK delivered the judgment of the court, with opinion.
Presiding Justice McLaren concurred in the judgment and opinion.
Justice Birkett concurred in part and dissented in part, with opinion.

**OPINION**

¶ 1    In 2012, a jury convicted the defendant, Zachary Reyes, of one count of first degree murder

(720 ILCS 5/9-1(a)(1), (a)(2) (West 2008)) and two counts of attempted murder with a firearm (*id.*

§ 8-4(a), 9-1(a)(1)), all committed during a single incident when he was 16 years old. Although

the trial court sentenced Reyes to the minimum sentence possible on each count, the law required

add-ons for his use of a firearm and also required the sentences to run consecutively, with the result

that Reyes's sentence was a mandatory minimum of 97 years' imprisonment. Our supreme court

ultimately determined that Reyes's sentence was an unconstitutional mandatory *de facto* life

sentence and remanded for a new sentencing hearing. *People v. Reyes*, 2016 IL 119271, ¶ 9.

¶ 2     On remand, the trial court sentenced Reyes to 66 years' imprisonment. Reyes appealed, and we vacated Reyes's sentence and remanded to the trial court for resentencing, finding that the sentence did not comply with the requirements for sentencing a defendant who committed his crimes while he was a minor, as set out by the United States Supreme Court in *Miller v. Alabama*, 567 U.S. 460 (2012), and the Illinois Supreme Court's decision in *People v. Holman*, 2017 IL 120655. On remand, the trial court once again sentenced Reyes to 66 years' imprisonment.

¶ 3     Reyes again appeals, arguing that the trial court violated our mandate as well as the federal and Illinois constitutions by imposing a *de facto* life sentence without finding that he was permanently incorrigible. He also argues that, even if the trial court was not required to make such a finding, the trial court relied on improper factors in determining his sentence. For the reasons that follow, we vacate and remand.

¶ 4                          I. BACKGROUND

¶ 5                          A. Original Proceedings

¶ 6     In 2010, Reyes was charged with the first degree murder of Jason Ventura and the attempted murders of Eduardo Gaytan and Jorge Ruiz. The indictment alleged that on December 20, 2009, defendant personally discharged a firearm in the direction of a vehicle occupied by Ventura, Gaytan, and Ruiz and that defendant's actions caused the death of Ventura, as well as serious injury to Gaytan. Reyes, who was 16 years old at the time of the shootings, was prosecuted as an adult. See 705 ILCS 405/5-130(1)(a)(i) (West 2008). Following a jury trial, he was found guilty of the charged offenses.

¶ 7     The trial court imposed the mandatory minimum sentence of 45 years' imprisonment for the first degree murder conviction, consisting of the minimum 20-year sentence for murder (see 730 ILCS 5/5-4.5-20(a) (West 2008)) plus a 25-year mandatory firearm enhancement (*id.* § 5-8-1(a)(1)(d)(iii)). The court also sentenced Reyes to 26 years' imprisonment on each of the two

convictions of attempted murder: the minimum 6-year sentence for attempted murder (see *id.* § 5-4.5-25(a)) plus the 20-year mandatory firearm enhancement (*id.* § 5-8-1(a)(1)(d)(ii)). In addition, as required by statute (see *id.* § 5-8-4(d)(1)), the trial court found that all of Reyes's sentences must run consecutively to each other. As a result, Reyes was sentenced to a mandatory minimum aggregate sentence of 97 years' imprisonment.

¶ 8       Reyes appealed, arguing in part that his sentence was unconstitutional pursuant to *Miller*, 567 U.S. at 479, in which the United States Supreme Court held that a sentencing scheme that mandated a sentence of natural life in prison without the possibility of parole for juvenile offenders violated the eighth amendment of the federal constitution. See *People v. Reyes*, 2015 IL App (2d) 120471, ¶ 16. Reyes argued that his aggregate term-of-years sentence was a *de facto* mandatory natural life term of imprisonment and was likewise unconstitutional under *Miller*. *Id.* The Illinois Supreme Court agreed with this argument. *Reyes*, 2016 IL 119271, ¶ 9. The court concluded that Reyes's *de facto* life sentence constituted cruel and unusual punishment in violation of the eighth amendment and therefore vacated his sentence (*id.* ¶ 10), remanding the case for resentencing (*id.* ¶ 12).

¶ 9       In its ruling, the court noted that, while Reyes's appeal was pending, the legislature had enacted a new law, codified at section 5-4.5-105 of the Unified Code of Corrections (Code) (730 ILCS 5/5-4.5-105 (West 2018)), which (1) required a court sentencing a juvenile offender to take into account several mitigating factors in determining the appropriate sentence and (2) made the imposition of firearm enhancements on a juvenile offender a matter of discretion. *Reyes*, 2016 IL 119271, ¶ 11. The court held that Reyes should be resentenced in accordance with the new statute. *Id.* ¶ 12.

¶ 10                               B. First Resentencing

¶ 11    On remand, the trial court ordered a new presentence investigation report (PSI) and, at Reyes's request, psychological testing. In September 2017, Reyes underwent an evaluation of his mental health and intellectual abilities. The report from that evaluation indicated that Reyes received special education accommodations in school from 2002 to 2009. During that time, he suffered from attention-deficit/hyperactivity disorder (ADHD) and took medication for that condition. ADHD caused problems with inattention and impulsivity but was not classified as an intellectual disability. When Reyes took his medication, he showed marked progress in his academic functioning. However, in seventh and eighth grade Reyes stopped taking his medication and exhibited behavioral issues as a result. In seventh grade, he was suspended for gang-related writing. On a General Ability Index (GAI) evaluation, which the report indicated "represent[ed] a reliable and valid estimate of his overall intellectual ability," Reyes scored in the 10th percentile, which indicated that he was in the low average range of functioning. The report noted that, despite Reyes's ADHD and low GAI score, he did not meet the criteria for intellectual disability as defined by section 5-1-13 of the Code (730 ILCS 5/5-1-13 (West 2016)).

¶ 12    The 2017 PSI indicated that, before the charges in this case, Reyes's juvenile record consisted of one charge of unlawful possession of a firearm without a valid firearm owner's identification card. At the time of his arrest, he was in the ninth grade at East Aurora High School. Since he had been incarcerated, he had taken classes and earned numerous certificates, in roofing, insulation, and vinyl decking. He had also earned an anti-violence awareness certificate and had attended Bible study classes. The report indicated that his parents never married and his father did not play an active role in his life. He grew up at home with his mother and with four half-siblings. He described his relationship with his half-siblings as "good." Reyes became involved with the Latin Kings street gang when he was 13 or 14 years old. Reyes expressed remorse for his offenses and specifically for the death of Ventura.

¶ 13    According to the PSI, a "Level of Service Inventory-Revised" (LSI-R) was administered to predict Reyes's risk to reoffend, based on the factors and details that were relevant to him at the time of the offenses, December 20, 2009. According to Reyes's LSI-R, Reyes was a medium risk for recidivism at the time of the commission of the offense. The PSI also noted that, at the time of his arrest in December 2009, Reyes was on probation for his previous juvenile charge of unlawful possession of a weapon. Based on that, the PSI stated that Reyes's attitude was supportive of crime.

¶ 14    An addendum to the PSI included a written statement from Reyes, expressing remorse for the shooting and stating that he took full responsibility for his actions. Reyes added that, while incarcerated, he had been taking classes because he wanted to learn and become a better person. On the night of the shooting, older members of the Latin Kings had taken advantage of him because he wanted to be liked, had low self-esteem, and did not know how to refuse them when they asked him to shoot.

¶ 15    At the second sentencing hearing, the State submitted two disciplinary reports for Reyes from the Menard Correctional Center, from July 2012 and May 2014. Both disciplinary tickets were for possession of contraband: one for having a weapon (a piece of metal that had a hook on one end) and one for literature related to the Latin Kings (the Latin Kings "Holy Prayer" and "Code of Kingdom"). The State also submitted an April 2016 affidavit from Reyes, which had been filed in a different Kendall County case against a codefendant, Francisco Salazar. In the affidavit, Reyes admitted to receiving the gun used in the shooting from higher ranking members of the Latin Kings and firing all the shots into Ventura's car based on orders from the higher-ranking gang members. Reyes also claimed that Salazar was not aware of the gun or the plan. This differed from Reyes's testimony at his own trial, where he had testified that he was not the one who fired the shots towards Ventura's car.

¶ 16    Reyes submitted his school records, which showed that he had an Individual Education Plan (IEP) and was in the ninth grade at age 16. Reyes's mother testified that Reyes had had an IEP since first grade. He was ultimately diagnosed with ADHD. Reyes always scored below average and was considered learning disabled. Reyes struggled socially and did not have many friends. Reyes's mother testified that the other people involved in the crime were not people with whom Reyes normally associated. On cross-examination, Reyes's mother acknowledged that his problems in school were also related to his behavior and that his behavior problems were the main reason he was placed in special schools. She was not aware that Reyes's IEP reports indicated that he had gang affiliations as early as 2007.

¶ 17    After the sentencing hearing, the trial court sentenced Reyes to prison for 66 years: 25 years on the first degree murder conviction, plus a 25-year firearm add-on; 10 years for the attempted murder of Gaytan but, as permitted by the new sentencing law for juveniles, the trial court exercised its discretion not to apply the "mandatory" firearm enhancement; and 6 years for the attempted murder of Ruiz, again without the firearm enhancement. All sentences were to run consecutively.

¶ 18    Reyes appealed, arguing that the trial court abused its discretion in sentencing him to a 66-year *de facto* life sentence without adequately considering his youth and attendant circumstances. Reyes's challenge to his sentence was based on *Miller* and *Holman*. We vacated Reyes's sentence and remanded for resentencing with the following comments:

   "In this case, the trial court imposed a *de facto* life sentence on the defendant, but the record does not reflect a determination by the trial court that the defendant was among the rarest of juvenile offenders whose 'conduct showed irretrievable depravity, permanent incorrigibility, or irreparable corruption beyond the possibility of rehabilitation.' [*Holman*, 2017 IL 120655,] ¶ 46. *** On remand, the trial court could once again impose a *de facto*

life sentence *only* if it determines that the defendant is beyond rehabilitation." (Emphasis in original.) *People v. Reyes*, 2020 IL App (2d) 180237, ¶ 32.

¶ 19                                C. 2021 Resentencing

¶ 20    On remand, a third judge presided over the sentencing hearing and pronounced sentence. In aggravation, the State presented the same evidence presented at the 2018 sentencing hearing, along with a new witness, Kellie Vanderlei, who prepared a 2021 update to the PSI. She testified that, according to the Adult Risk Assessment she administered to Reyes, he had a high risk of recidivism due to his "high level of need" in the areas of education, employment, financial situation, neighborhood problems, and peer association, all assessed as of the time of his 2009 arrest. On cross-examination, she explained that the assessment was substantially affected by Reyes's young age when he was arrested. For instance, he was supported by his mother and was not able to support himself. (The PSI update noted that the only employment he had ever had was after he was incarcerated.) If he had had more education or had lived in a less dangerous neighborhood, the assessment would have rated him as a lower risk for recidivism.

¶ 21    As mitigation, in addition to the 2018 sentencing hearing evidence, Reyes presented (1) school records showing that he needed special education services because of his learning disability and low average intelligence and abilities and (2) numerous certificates he had earned in the classes he had taken in prison. Three witnesses—his brother and two middle school teachers—testified to Reyes's childhood experiences. They testified that Reyes was picked on because he was "slow" and that he was vulnerable to recruitment by a street gang because he longed to be "cool."

¶ 22    The 2021 PSI update noted that Reyes had worked in the kitchen at the Menard correctional facility and in the cell house and kitchen at Pontiac. He had incurred two additional disciplinary infractions in 2019. One was for fighting: Reyes explained that an inmate at Menard had ordered

him to kill another inmate, and when Reyes refused, the inmate fought with him. After that, Reyes had been placed in protective custody and then transferred to Pontiac. The other infraction was for stealing. Reyes said that a supervisor who did not like him had written him up for stealing ice. Generally, however, he reported that he was able to develop a rapport with the correctional facility staff and had not been in trouble with them, and Vanderlei observed that this was borne out by Reyes's comfortable interactions with the guards prior to the interview. Finally, Reyes submitted a new written statement in allocution, in which he expressed remorse and guilt for killing Ventura, saying that it was an impulsive act committed at the behest of other gang members.

¶ 23    The trial court again sentenced Reyes to 66 years of imprisonment, consisting of the same components as before. It issued a written decision that began by listing the things the court was required to consider and stating that it had considered all of them. After recounting the circumstances of the shooting as established at trial, the trial court considered factors in mitigation and aggravation. The trial court stated that none of the factors listed in the general mitigation statute, section 5-5-3.1 of the Code (730 ILCS 5/5-5-3.1 (West 2018)), applied to Reyes. It expressly noted that subparagraph (13)—intellectual disability—did not apply, as the 2017 examination had concluded that Reyes did not meet the statutory definition for intellectual disability. See *id.* § 5-5-3.1(a)(13).

¶ 24    The trial court then considered the additional mitigating factors listed in section 5-4.5-105 of the Code (*id.* § 5-4.5-105), the youth sentencing provision enacted by the General Assembly in the wake of *Miller*. That provision requires that, when a trial court sentences someone for an offense committed when the person was not yet 18 years old, the court must "consider the following additional factors in mitigation in determining the appropriate sentence":

"(1) the person's age, impetuosity, and level of maturity at the time of the offense, including the ability to consider risks and consequences of behavior, and the presence of cognitive or developmental disability, or both, if any;

(2) whether the person was subjected to outside pressure, including peer pressure, familial pressure, or negative influences;

(3) the person's family, home environment, educational and social background, including any history of parental neglect, physical abuse, or other childhood trauma;

(4) the person's potential for rehabilitation or evidence of rehabilitation, or both;

(5) the circumstances of the offense;

(6) the person's degree of participation and specific role in the offense, including the level of planning by the defendant before the offense;

(7) whether the person was able to meaningfully participate in his or her defense;

(8) the person's prior juvenile or criminal history; and

(9) any other information the court finds relevant and reliable, including an expression of remorse, if appropriate. However, if the person, on advice of counsel chooses not to make a statement, the court shall not consider a lack of an expression of remorse as an aggravating factor." *Id.*

¶ 25 Regarding the first factor, the defendant's "age, impetuosity, and level of maturity at the time of the offense," including the ability to consider the risks and consequences of his behavior and any cognitive or developmental disability, the trial court noted that Reyes's chronological age at the time of the offense was 16. However, four years earlier in 2005, an intelligence test had found that Reyes was "about two years behind where he should have been age-wise." The trial court noted that Reyes had ADHD but was able to function "remarkably well" at school when he took medication. Reyes stopped taking medication in middle school (Reyes has stated that this was

because his mother could no longer obtain it) and became attracted to a gang. The trial court noted that, "[f]rom the records admitted into evidence and the testimony at the sentencing hearing, there is evidence of impetuosity—that the defendant would act impulsively, and suffer adverse consequences for such acts." Additionally, Reyes was in the low average range of intelligence. Nevertheless, the trial court found that there was "nothing to indicate that the defendant lacked the ability to consider the risks and consequences of his behavior." The trial court found that this first statutory factor weighed slightly in favor of imposing a lower sentence.

¶ 26     As to the second factor, outside pressure, the trial court found that Reyes was "subject to peer pressure and negative influences by virtue of his association with members of the Latin Kings street gang," and thus this factor also weighed slightly in favor of a lower sentence. The third factor, family environment, was not mitigating, as Reyes's home environment appeared relatively stable and supportive. There was evidence that Reyes had the potential for rehabilitation, as he had completed several classes while in custody, and this fourth factor also weighed in favor of a lesser sentence.

¶ 27     The trial court found that the circumstances of the offense were not mitigating, nor was there anything mitigating about Reyes's degree of participation in the offense. Accordingly, the fifth and sixth factors did not apply. Similarly, the seventh factor did not apply, as Reyes was able to participate meaningfully in his defense. Reyes had some criminal history, including the possession of a gun and threatening another student at school, so this factor was not mitigating.

¶ 28     The final youth-sentencing factor allows a trial court to consider, as a mitigating factor, anything else it finds relevant. *Id.* § 5-4.5-105(a)(9). The trial court reviewed the 2021 PSI update, which included information on the two additional disciplinary infractions committed by Reyes in 2019. The trial court also specifically noted that the Adult Risk Assessment rated Reyes as a high risk for recidivism, which was "different from the prior LSI-R Assessment indicating a medium

risk to re-offend." Reyes had written several statements accepting responsibility for Ventura's murder and expressing remorse, but the trial court noted that, in his initial written statement in allocution made in 2012, Reyes had said that there was "no type of plan or target to kill Jason Ventura and shoot at his friends but the disrespect came from them *** first." The trial court disapprovingly observed that this attempt to justify the shooting did not "truly indicate remorsefulness for one's crime." (Although the trial court presumably also read Reyes's later statements of remorse at his more recent sentencing hearings, both of which show more acceptance of responsibility and do not blame the victim, the trial court did not comment on them.) The trial court also highlighted Reyes's 2016 affidavit in which he took sole responsibility for the shooting (contrary to his testimony at trial) in an effort to exculpate Salazar and commented that it did not find the affidavit credible. Considering all of this under the "anything else" factor, the trial court did not find that factor to weigh in favor of a lesser sentence.

¶ 29 The trial court then turned to the factors in the general aggravation statute, section 5-5-3.2 of the Code (*id.* § 5-5-3.2). It noted that most of them were not applicable, commenting only on the first, third, seventh, and fifteenth factors:

> "(1) The defendant's conduct caused or threatened serious harm. This almost goes without saying, given the nature of these crimes. However, I do give this factor great weight.
>
> (3) The defendant has a history of prior delinquency or criminal activity. While this is true, I have not placed great weight on this factor.
>
> (7) The sentence is necessary to deter others from committing the same crime. While this is true in almost all instances, it is particularly appropriate here as gun violence has no place in our communities or society. Killing one person and attempting to kill two

others because you think you were disrespected is unacceptable. Again, this is a factor to which I give great weight.

(15) The defendant committed an offense related to the activities of an organized gang. The evidence at trial is that the events of December 19-20, 2009 were related to an organized gang activity, and I give this factor substantial weight as well."

¶ 30    The trial court then stated that, in selecting a sentence, it had considered the prior appeals in the case and the case law relevant to the sentencing of young offenders, including the Illinois Supreme Court's decisions in *Holman* and *People v. Buffer*, 2019 IL 122327, and the United States Supreme Court's decisions in *Roper v. Simmons*, 543 U.S. 551 (2005), *Miller*, *Montgomery v. Louisiana*, 577 U.S. 190 (2016), and *Jones v. Mississippi*, 593 U.S. ___, 141 S. Ct. 1307 (2021). The trial court relied particularly on *Jones*, in which the United States Supreme Court stated that *Miller* and *Montgomery*, while recognizing the special characteristics of youth that made mandatory sentences of life without parole unacceptable under the eighth amendment, nevertheless permitted the imposition of such sentences so long as the sentencing judge had discretion to consider the mitigating qualities of youth. *Jones* also held that the eighth amendment did not require a sentencing judge, before imposing such a sentence, to make a separate factual finding that the young offender was permanently incorrigible. The trial court emphasized this holding when declining to make a determination that Reyes was permanently incorrigible.

¶ 31    Before pronouncing sentence, the trial court stated that it would have preferred to give Reyes an even longer sentence than he had previously received, but it was prevented from doing so by section 5-5-4 of the Code (730 ILCS 5/5-5-4 (West 2018)), which bars a resentencing court from imposing a more severe sentence than the defendant initially received, unless the greater sentence is based on conduct occurring after the original sentencing:

"The nature of these crimes and the facts and the circumstances as presented at trial most likely would have lead [*sic*] me to impose a greater sentence for the offense of First Degree Murder, had I been assigned this case at the time of the first re-sentencing [*sic*] hearing. However, I am mindful that I am prohibited from doing so by statute at this time."

The court then imposed the same sentence on Reyes that was imposed at his second sentencing. For first degree murder, the sentence was 25 years plus a 25-year firearm add-on, for a total of 50 years' imprisonment, all of which must be served. On the two attempted murder convictions, Reyes again received 10 years on one and 6 years on the other, both without the firearm enhancement. On those two counts, the law required that at least 85% of the sentence be served. All sentences were to run consecutively, resulting in a total sentence of 66 years.

¶ 32    Reyes moved for reconsideration, arguing that the court should not impose such a *de facto* life sentence without making an explicit finding that he was permanently incorrigible and beyond rehabilitation and that both our mandate and the Illinois Supreme Court's holding in *Holman* required such a finding. The trial court rejected that argument and denied the motion. Relying on *Jones*, the trial court stated that it did not believe that it was required to make such a finding and declined to do so.

¶ 33                                    II. ANALYSIS

¶ 34    Reyes again appeals his sentence, raising several arguments. The parties devote most of their attention to the issue of whether the trial court violated the federal and Illinois constitutions by imposing a *de facto* life sentence without first finding that Reyes was permanently incorrigible. However, we are to address constitutional arguments only if the case cannot be decided on other grounds. *Innovative Modular Solutions v. Hazel Crest School District 152.5*, 2012 IL 112052, ¶ 38. We thus begin by considering the nonconstitutional arguments raised by Reyes.

¶ 35          A. The Trial Court's Application of Relevant Statutory Sentencing Factors

¶ 36    "It is well settled that the trial court has broad discretionary powers in imposing a sentence [citation], and the trial court's sentencing decision is entitled to great deference [citation]." *People v. Stacey*, 193 Ill. 2d 203, 209 (2000). However, "[a]lthough the trial court is vested with wide discretion in sentencing, such discretion is not without limitation." *Id.* The weight to be attributed to each factor in aggravation and mitigation depends upon the particular circumstances of the case. *Id.* A trial court need not expressly state that it has considered each of the mitigating factors. *People v. Ayala*, 386 Ill. App. 3d 912, 920 (2008). There is a presumption that the trial court considered all relevant factors in determining a sentence, and that presumption will not be overcome without explicit evidence from the record that the trial court did not consider mitigating factors or relied on improper aggravating factors. *People v. Payne*, 294 Ill. App. 3d 254, 260 (1998).

¶ 37    Thus, we review deferentially the trial court's assessment of the proper weight to be given to each of the statutory mitigating and aggravating factors. However, the question of whether the trial court relied upon improper sentencing factors is reviewed *de novo*. *People v. Abdelhadi*, 2012 IL App (2d) 111053, ¶ 8. Similarly, when the question is whether the trial court interpreted the statutory factors correctly, our review is *de novo*. *People v. Merriweather*, 2022 IL App (4th) 210498, ¶ 26. "In determining whether the trial court based the sentence on proper aggravating and mitigating factors, a court of review should consider the record as a whole, rather than focusing on a few words or statements by the trial court." *People v. Larson*, 2022 IL App (3d) 190482, ¶ 29. "A sentence based on improper factors will not be affirmed unless the reviewing court can determine from the record that the weight placed on the improperly considered aggravating factor was so insignificant that it did not lead to a greater sentence." *People v. Heider*, 231 Ill. 2d 1, 21 (2008).

¶ 38    Reyes contends that the trial court erred in its application of the statutory sentencing factors, both the youth-related mitigating factors in section 5-4.5-105 of the Code (730 ILCS 5/5-

4.5-105 (West 2018)) and the general aggravating factors set out in section 5-5-3.2 (*id*. § 5-5-3.2). . He argues that these errors arose in several ways.

¶ 39    In considering Reyes's arguments, we rely on the familiar principles of statutory interpretation: our task is to give effect to the legislature's intent, and the best indicator of that intent is the plain language of the statute, which controls if that language is clear and unambiguous. *Lee v. John Deere Insurance Co.*, 208 Ill. 2d 38, 43 (2003). "One of the fundamental principles of statutory construction is to view all provisions of an enactment as a whole," and thus "words and phrases must be interpreted in light of other relevant provisions of the statute." *J.S.A. v. M.H.*, 224 Ill. 2d 182, 197 (2007). "A court may also consider the reason for the statute, the problems it seeks to remedy, the purposes to be achieved, and the consequences of interpreting the statute one way or another." *Sperl v. Henry*, 2018 IL 123132, ¶ 23.

¶ 40    Reyes first argues that the trial court's consideration of the need to deter others from committing the same crime, a general aggravating factor (730 ILCS 5/5-5-3.2(a)(7) (West 2018)), was categorically improper when sentencing a juvenile offender. Reyes grounds this argument in *Miller*, which stated that the need for deterrence cannot justify a life sentence for a juvenile offender because " ' "the same characteristics that render juveniles less culpable than adults" '— their immaturity, recklessness, and impetuosity—make them less likely to consider potential punishment." *Miller*, 567 U.S. at 472 (quoting *Graham v. Florida*, 560 U.S. 48, 72 (2010), quoting *Roper v. Simmons*, 543 U.S. at 571). We reject this argument.

¶ 41    By considering the need for deterrence, the trial court was doing no more than applying the law as enacted by the General Assembly. That body decided, after due consideration and debate, to implement the teachings of *Miller* by enacting section 5-4.5-105 of the Code, which lists potential mitigating factors to be considered *in addition to* the general statutory mitigating and aggravating factors when sentencing juvenile offenders. 730 ILCS 5/5-4.5-105(a) (West 2018)

("the court *** shall consider the following *additional* factors in mitigation in determining the appropriate sentence" (emphasis added)). Notably, when identifying the sentencing factors applicable to juvenile offenders, the legislature did not choose to place any limitations on courts' consideration of the general factors in aggravation, such as the need for deterrence—even if over-reliance on those factors might be contrary to the teachings of *Miller*.[1] Because the legislature simply grafted the new, youth-related sentencing factors onto the existing sentencing scheme, the trial court did not err in considering the need for deterrence as an aggravating factor—it was simply following the plain directives of the sentencing statutes.

¶ 42    In a similar vein, Reyes argues that the trial court acted improperly when it considered Reyes's gang associations both as a slight mitigating factor under section 5-4.5-105(a)(2) (which asks whether the offender was "subjected to outside pressure, including peer pressure *** or

---

[1]It is possible that certain aspects of Illinois's current sentencing scheme—such as the lack of any recognition that some aggravating factors like deterrence should perhaps receive less weight when the offender is a juvenile—may run afoul of *Miller*'s holdings. This concern has led some Illinois courts to vacate the sentences of juvenile offenders where the trial courts relied heavily on the need for deterrence. See *People v. Nieto*, 2020 IL App (1st) 121604-B, ¶ 58; *People v. Haynie*, 2020 IL App (1st) 172511, ¶¶ 34-35; *People v. Morris*, 2017 IL App (1st) 141117, ¶ 33; *cf. People v. Smith*, 2022 IL App (4th) 200666, ¶¶ 28-30 (rejecting the argument that *Miller* forbids the consideration of deterrence as an aggravating factor in sentencing juvenile offenders). Reyes does not argue that the sentencing scheme for juvenile offenders is unconstitutional as a whole, however, and thus we do not address this issue. He simply argues that the trial court should not have considered the statutory aggravating factor of deterrence when sentencing a juvenile offender such as him. As we state, however, the trial court was obliged to follow the law as written.

negative influences" (*id.* § 5-4.5-105(a)(2)) and as a substantial aggravating factor under section 5-5-3.2(a)(15) (whether the offense was "related to the activities of an organized gang" (*id.* § 5-5-3.2(a)(15))). We agree that these two statutory provisions are challenging to harmonize and that, again, the legislature may not have fully thought through the practicalities in choosing to leave section 5-5-3.2's "gang-related" aggravating factor intact while adding the mitigating factor of peer pressure to commit the offense. Here again, however, the real problem lies with the interaction between the youth-related mitigating factors of section 5-4.5-105 and the general aggravating factors of section 5-5-3.2, not with the trial court, which simply applied both statutes as they direct. And although Reyes argues that the trial court should not have weighed these competing mitigating and aggravating factors as it did, the weight to be given to various sentencing factors is a matter within the trial court's sound discretion, to which we must afford great deference. *Stacey*, 193 Ill. 2d at 209. Reyes has not overcome that deference here.

¶ 43 Reyes next argues that the trial court erred in considering the Adult Risk Assessment as a valid measure of his risk to reoffend, because the assessment is based on factors that are generally inapplicable to a juvenile. We agree. As was established during the cross-examination of Vanderlei, here that assessment was based on Reyes's situation in 2009, at the time of the offense. But the 16-year-old Reyes had no control over several of the key negative indicators in that assessment, such as the fact that he lived in a high-crime area, and his very youth itself prevented him from having other indicators of a low risk, such as the completion of high school and the securing of employment. Moreover, the assessment does not appear to take into account the greater rehabilitative potential of young offenders documented in studies and highlighted in *Miller*, 567 U.S. at 471-72. The trial court's characterization of this assessment as "relevant and reliable" evidence was against the manifest weight of the evidence.

¶ 44    The trial court also erred in considering this assessment, along with other evidence it clearly viewed as negative, when considering applicable mitigating youth-related factors under section 5-4.5-105(a) of the Code (730 ILCS 5/5-4.5-105(a) (West 2018)). That provision permits a sentencing court to consider, as an additional mitigating factor.

¶ 45    "any other information the court finds relevant and reliable, including an expression of remorse, if appropriate. However, if the person, on advice of counsel chooses not to make a statement, the court shall not consider a lack of an expression of remorse as an aggravating factor." *Id.* § 5-4.5-105(a)(9). The language and structure of section 5-4.5-105(a) make it clear that the purpose of subsection (a)(9) is to enable a sentencing court to consider other *mitigating* factors not specifically enumerated elsewhere in the statute. Further, as shown by the subsection's cautionary note about statements of remorse, if evidence is not mitigating, the court should not consider it under this subsection. The trial court erred in using this provision as an opportunity to consider nonmitigating evidence.

¶ 46    Reyes also argues that the trial court incorrectly interpreted the statutory factor of his ability to consider the risks and consequences of his behavior at the time of the offense. This evaluation is part of the first youth-related factor, which requires the sentencing court to consider "the person's age, impetuosity, and level of maturity at the time of the offense, including the ability to consider risks and consequences of behavior, and the presence of cognitive or developmental disability, or both, if any." *Id.* § 5-4.5-105(a)(1). In discussing this factor, the trial court noted that Reyes was 16 at the time of the offense and that, by at least one measure, his low average intelligence put his mental age about two years behind his peers of the same age. The trial court also found there was evidence that Reyes had ADHD, was impetuous, and "would act impulsively, and suffer adverse consequences for such acts." However, it then immediately found that, despite Reyes's low average "range of functioning," there was nothing to indicate that Reyes lacked the

ability to consider the risks and consequences of his behavior. This latter finding was against the manifest weight of the evidence and shows a misinterpretation of the plain statutory language.

¶ 47    An impaired "ability to consider the risks and consequences of behavior" refers to the young brain's ability to accurately understand and assess the likely results of certain conduct, not simply intelligence or general ability to function. The trial court's own finding that Reyes would act impulsively despite suffering adverse consequences from his actions demonstrates that Reyes was *not* able to consider the risks and consequences of his behavior. The trial court erred by ignoring this evidence and misinterpreting the statutory language to reach a contrary conclusion.

¶ 48    Reyes next argues that the trial court improperly imposed a *de facto* life sentence despite recognizing Reyes's rehabilitative efforts and potential. Here, Reyes is essentially arguing that, because *Miller* and *Holman* stated that a juvenile offender should not be sentenced to lifelong imprisonment unless the offender is irredeemably corrupt or malevolent, a court cannot impose such a sentence if it has found that the offender has some rehabilitative potential.

¶ 49    To the extent that Reyes is raising a constitutional argument here, we must decline to address it if we can resolve the case on other grounds. Thus, here we consider *only* whether the trial court incorrectly applied the statutory mitigating factor of rehabilitative potential. Our legislature implemented *Miller*'s tenets by making "the person's potential for rehabilitation" one of the youth-related factors that a court sentencing a juvenile must consider. *Id.* § 5-4.5-105(a)(4). Section 5-4.5-105 does not prevent a trial court from giving extra weight to the factor of rehabilitative potential, or finding that factor to be dispositive in appropriate cases. However, neither does it categorically bar a court from sentencing a juvenile to a *de facto* life sentence despite finding that the juvenile has some rehabilitative potential. Rather, under the plain language of the statute, a juvenile's rehabilitative potential is one factor—albeit an important one—for the court to consider. See *id.* (including potential for or evidence of rehabilitation as one factor among

several that courts must consider). We thus confine our analysis to holding that, under the current sentencing statutes (the constitutionality of which we do not address here), the trial court was not required to treat this factor as dispositive.

¶ 50    Reyes lastly argues that the trial court relied on improper factors in sentencing him by impermissibly considering, as an aggravating factor, conduct that was inherent in his offenses of conviction. Section 5-5-3.2(a)(1) of the Code permits a court to consider, as an aggravating factor in sentencing, that a defendant's conduct "caused or threatened serious harm." *Id.* § 5-5-3.2(a)(1). However, it is improper for a court to rely on this factor when the causation of serious harm is inherent in the offense.

> "Generally, a factor implicit in the offense for which the defendant has been convicted cannot be used as an aggravating factor in sentencing for that offense. [Citation.] Stated differently, a single factor cannot be used both as an element of an offense and as a basis for imposing 'a harsher sentence than might otherwise have been imposed.' [Citation.] Such dual use of a single factor is often referred to as a 'double enhancement.' [Citation.] The prohibition against double enhancements is based on the assumption that, in designating the appropriate range of punishment for a criminal offense, the legislature necessarily considered the factors inherent in the offense." *People v. Phelps*, 211 Ill. 2d 1, 11-12 (2004).

¶ 51    Reyes was convicted of first degree murder and attempted murder, convictions that necessarily include as an element that he caused death and threatened the death of others. See 720 ILCS 5/9-1(a) (West 2018). Thus, it was improper for the trial court to have given "great weight" to the aggravating factor that Reyes's conduct caused or threatened serious harm. See *People v. Saldivar*, 113 Ill. 2d 256, 272 (1986). Similarly, the trial court stated that it placed "great weight" on the aggravating factor of deterrence because Reyes engaged in gun violence, which "has no

place in our society." However, the trial court also imposed a 25-year add-on (discretionary when sentencing juvenile offenders), for personally discharging a gun, to Reyes's sentence. See 730 ILCS 5/5-8-1(a)(1)(d)(iii) (West 2018).

¶ 52    Where, as here, the record shows clearly that the trial court relied in part on an improper factor in fashioning a defendant's sentence, we must remand for resentencing unless we can determine that the court gave negligible weight to the improper factor. "A sentence based on improper factors will not be affirmed unless the reviewing court can determine from the record that the weight placed on the improperly considered aggravating factor was so insignificant that it did not lead to a greater sentence." *Heider*, 231 Ill. 2d at 21.

¶ 53    Here, the trial court explicitly stated that it placed "great weight" on the improper aggravating factor of whether Reyes's conduct caused or threatened serious harm. Moreover, the trial court committed other legal errors in sentencing Reyes, such as relying on the results of an Adult Risk Assessment that lacked validity under the circumstances here and finding that Reyes was able as a 16-year-old to understand the risks and consequences of his behavior despite substantial evidence in the record demonstrating otherwise. Further, the trial court commented that it would have liked to impose a longer sentence but was prevented from doing so by statute, and in fact it improperly imposed a sentence for first degree murder that was five years more than Reyes initially received (25 years instead of 20)[2] and that included the discretionary 25-year add-

---

[2]This longer sentence on Reyes's first degree murder conviction violates section 5-5-4(a) of the Code, which provides that, in resentencing an offender after a successful appeal, a trial court may not impose a sentence that is "more severe than the prior sentence." 730 ILCS 5/5-5-4(a) (West 2018). Reyes's original sentence for first degree murder totaled 45 years (20 years for the

on for the use of a firearm. All of this indicates that the trial court's errors may well have increased Reyes's sentence. See *id.* at 24-25 (reliance on improper factor could not be deemed insignificant when the defendant received 4 years more than the minimum of a 6- to 30-year sentencing range). As we cannot rule out the possibility that the trial court's consideration of improper factors affected its judgment about the proper sentence, we must vacate that sentence. *Id.* at 21.

¶ 54 As the trial court's sentencing errors require us to vacate Reyes's sentence, we do not address Reyes's remaining arguments.

¶ 55 B. Reassignment on Remand; Failure to Comply with Mandate

¶ 56 Reyes asks that we remand to a different judge for resentencing. Our supreme court has stated that this can be a proper course of action "to remove any suggestion of unfairness." *Id.* at 25; see also *People v. Woods*, 2018 IL App (1st) 153323, ¶ 39. We grant this request, based in large part on the refusal of the previous sentencing judge to comply with our mandate.

¶ 57 It is well established in precedent stretching back more than a century that "a trial court must obey the clear and unambiguous directions in a mandate issued by a reviewing court." *People ex rel. Daley v. Schreier*, 92 Ill. 2d 271, 276 (1982) (collecting cases). "[W]hen a reviewing court issues a mandate, it vests the trial court with jurisdiction to take only such action as conforms to that mandate." *Id.* Even where the reviewing court's directions are erroneous, the trial court is nonetheless required to strictly follow those directions. *Id.* at 277; see also *Chicago Ry. Equipment*

---

offense itself, plus a 25-year add-on for using a gun). This sentence was improperly increased in the second sentence Reyes received, but we vacated that sentence in its entirety. Thus, in a subsequent resentencing, the trial court could not impose any sentence longer than the 45 years that Reyes initially received for first degree murder unless it found an increase appropriate based on Reyes's conduct after his original sentencing. *Id.* The trial court here made no such finding.

*Co. v. National Hollow Brake Beam Co.*, 239 Ill. 111, 115 (1909) (although a reviewing court "may err in its directions to an inferior court, *** however erroneous the directions given may be, it is the duty of the inferior court to strictly follow the directions contained in the mandate" of the reviewing court). "Any other order issued by the trial court is outside the scope of its authority ***." *Schreier*, 92 Ill. 2d at 276-77.

¶ 58    The trial court here violated this blackletter law. In our previous decision, we vacated Reyes's sentence because the record did not show that the trial court had determined that the defendant was permanently incorrigible. *Reyes*, 2020 IL App (2d) 180237, ¶ 32. In doing so, we relied on *Holman*, in which our supreme court held that,

> "[u]nder *Miller* and *Montgomery*, a juvenile defendant may be sentenced to life imprisonment without parole, but only if the trial court determines that the defendant's conduct showed irretrievable depravity, permanent incorrigibility, or irreparable corruption beyond the possibility of rehabilitation." *Holman*, 2017 IL 120655, ¶ 46.

We remanded this case to the trial court to resentence Reyes with the following instruction: "On remand, the trial court could once again impose a *de facto* life sentence *only* if it determines that the defendant is beyond rehabilitation." (Emphasis in original.) *Reyes*, 2020 IL App (2d) 180237, ¶ 32. This direction was clear and unambiguous. Accordingly, the trial court was required to follow it. It did not do so.

¶ 59    In choosing not to make any finding about permanent incorrigibility, the trial court purported to rely on the recent United States Supreme Court case of *Jones*, which held that such a finding is not required by the eighth amendment. *Jones*, 593 U.S. at ___, 141 S. Ct. at 1320. The trial court apparently decided for itself that *Jones* allowed it to disregard both our mandate and the command of our supreme court in *Holman*. But this was not the task of the trial court, and it had no authority to reach this decision.

¶ 60    The State argues that the trial court was required to follow *Jones* instead of our mandate and *Holman* because, under the supremacy clause, the United States Supreme Court is the ultimate authority on the requirements of the federal constitution and its pronouncements are binding on all courts. U.S. Const., art. VI, cl. 2. Of course we do not dispute the supremacy clause, but it does not apply here. *Jones* did not forbid state courts from requiring sentencers to make a finding of permanent incorrigibility before imposing lifelong sentences on juvenile offenders, or tell sentencing courts that they need not comply with state law requiring such findings. To the contrary, the Court specifically stated that its decision "does not preclude the States from imposing additional sentencing limits" and that state courts of review are free to "require sentencers to make extra factual findings" when sentencing juvenile offenders. *Jones*, 593 U.S. at ___, 141 S. Ct. at 1323. Because *Jones* in no way restricted the power of this court (or the Illinois Supreme Court in *Holman*) to require that a trial court make a determination of permanent incorrigibility before imposing a *de facto* life sentence, the supremacy clause did not authorize the trial court to ignore our mandate.

¶ 61    As a fallback, the State suggests that the trial court implicitly found that Reyes was permanently incorrigible and thus complied with our mandate. This suggestion is refuted by the record, in which the trial court repeatedly insisted that it need not (and therefore would not) make such a finding. The trial court's vague allusion, when denying Reyes's motion to reconsider, to unspecified findings it made "that may do that" simply is not equivalent to our directive that the court must find that Reyes is "beyond rehabilitation" before imposing a *de facto* life sentence. The State's argument is also at odds with the trial court's finding that Reyes does have rehabilitative potential. We therefore reject the argument.

¶ 62    The trial court violated our mandate by imposing a *de facto* life sentence on Reyes without first determining that he was permanently beyond the possibility of rehabilitation. We note that

this violation would support the vacating of Reyes's sentence even if the trial court had not committed its various sentencing errors. See *Schreier*, 92 Ill. 2d at 276 ("when a reviewing court issues a mandate, it vests the trial court with jurisdiction to take only such action as conforms to that mandate"). It also supports our decision to direct that the case be assigned to a different judge for resentencing. The partial dissent by our colleague, which is based on a selective reading of the record, does not undermine either of our conclusions here: that the trial court made multiple errors in sentencing Reyes, all of which operated to disadvantage him, and that it deliberately chose not to comply with our mandate.

¶ 63   Finally, in remanding this case for resentencing, we recognize that our previous mandate was based on the rule established in *Holman*, 2017 IL 120655, ¶ 46. We are mindful that the continued vitality and scope of *Holman* is at issue in at least one case currently before the Illinois Supreme Court: *People v. Wilson*, 2021 IL App (3d) 200181-U, *appeal allowed*, No. 127666 (Ill. Jan. 26, 2022). On remand, it may be prudent for the trial court to exercise its discretion to delay resentencing Reyes for a reasonable period until the decision in *Wilson* is issued. If the trial court chooses to proceed with resentencing, it must follow any decision issued by the Illinois Supreme Court—in *Wilson* or any other case—that directly confirms or repudiates the command of *Holman* that a juvenile offender should not be sentenced to a *de facto* life unless the sentencing judge finds that he or she is "beyond the possibility of rehabilitation." *Holman*, 2017 IL 120655, ¶ 46. In the absence of any such Illinois Supreme Court decision, *Holman* must be followed.

¶ 64                                    III. CONCLUSION

¶ 65   For the foregoing reasons, we vacate Reyes's sentence and remand for resentencing consistent with this opinion. The cause is remanded to the chief judge of the criminal division to assign a new judge for resentencing.

¶ 66   Vacated and remanded.

¶ 67    JUSTICE BIRKETT, concurring in part and dissenting in part:

¶ 68    I agree with the majority that defendant is entitled to a new sentencing hearing because the trial court placed "great weight" on a factor inherent in the offenses, that "Reyes's conduct caused or threatened serious harm." Supra ¶ 50; see *People v. Saldivar*, 113 Ill. 2d 256, 272 (1986) ("the record demonstrates that the circuit court focused primarily on the end result of the defendant's conduct, *i.e.*, the death of the victim").

¶ 69    I disagree with the majority's directive to have a new judge assigned for resentencing. *Supra* ¶ 61. Our mandate in *People v. Reyes*, 2020 IL App (2d) 180237, provided that defendant could again be given a *de facto* life sentence only if the trial court "determine[d] that the defendant is beyond rehabilitation." *Id.* ¶ 32 (citing *People v. Holman*, 2017 IL 120655, ¶ 46). The majority now recognizes that the trial court acted properly in not considering a juvenile's rehabilitative potential as dispositive. *Supra* ¶ 47. The trial court relied on the United States Supreme Court's decision in *Jones v. Mississippi*, 593 U.S. ___, ___, 141 S. Ct. 1307, 1318-19 (2021), where the Court held that a finding of permanent incorrigibility is not required before a trial court may impose a discretionary life-without-parole sentence. In *Jones*, the Court explained that its "precedents do not require an on-the-record sentencing explanation with an implicit finding of permanent incorrigibility." *Id.* at ___, 141 S. Ct. at 1321.

¶ 70    I agree with the majority that, under ordinary circumstances, a trial court is bound by an appellate court mandate even when it is wrong. *Supra* ¶ 56. Our mandate in *Reyes* would have required the trial court to impose a sentence of less than 40 years because the trial court recognized that defendant had demonstrated some potential for rehabilitation by obtaining his G.E.D. and completing a number of classes while in custody. The trial court believed that the United States Supreme Court's decision in *Jones*, which was decided after our own decision in *Reyes*, did not

require it "to find Mr. Reyes to be specifically permanently incorrigible." The trial court believed that the sentence imposed was "consistent with the law that existed on the date [it] sentenced him."

¶ 71 A trial judge is "presumed to be impartial, and the burden of overcoming this presumption rests on the party making the charge of prejudice." *Eychaner v. Gross*, 202 Ill. 2d 228, 280 (2002). Erroneous rulings or findings are insufficient reasons to believe a court has a personal bias for or against a party. *Id.* (citing *In re Marriage of Hartian*, 222 Ill. App. 3d 566, 569 (1991)). As the State notes, defendant makes no argument that the trial judge was biased or lacks impartiality. At oral argument, defense counsel conceded that defendant was not arguing bias or prejudice on the part of the trial court. Counsel argued that *People v. Heider*, 231 Ill. 2d 1 (2008), supports defendant's request for the assignment of a new judge on remand. In *Heider*, the defendant was 19 years old at the time he was accused of predatory criminal sexual assault of a 12-year-old female. *Id.* at 3. The defendant was intellectually disabled.[3] *Id.* The defendant pleaded guilty but mentally ill. *Id.* at 5. At sentencing, the State requested a sentence of six years. *Id.* at 9. The trial judge imposed a sentence of 10 years. *Id.* at 11. A divided panel of the appellate court affirmed the conviction and sentence. *Id.* at 13. Our supreme court reversed and remanded for "resentencing to be conducted by a different judge." *Id.* at 25. The court held that the trial court erred by considering the defendant's intellectual disability as an aggravating factor. The court noted that intellectual disability is listed in the Unified Code of Corrections as a factor in mitigation. *Id.* at 12 (citing 730 ILCS 5/5-5-3.1(a)(13) (West 2002)). The supreme court stated that "there is nothing improper in

---

[3] The opinion used the terms "mentally retarded" and "mental retardation," drawn from the record but also utilized in Illinois statutes at the time. Our statutes have since been amended to replace those terms with the more socially acceptable terms "intellectually disabled" and "intellectual disability." See *People v. Clark*, 2023 IL 127273, ¶ 10 n. 1.

considering the effects of intellectual disability in this way [(as an aggravating factor)], so long as the evidence supports the conclusion that the defendant poses a future danger." *Id.* at 21. The Court stated that the record did not "support the circuit court's conclusion that the public should be 'terrif[ied]' of defendant." *Id.* at 23. The trial court also characterized the defendant as a " 'sexual predator *** who commits crimes against young people.' " *Id.* The record showed that, prior to having a sexual relationship with the 12-year-old victim, the defendant had no criminal history other than a few traffic tickets. *Id.* The record also showed that it was the victim "who pursued defendant." *Id.* The supreme court stressed that, at sentencing, the State "argued none of the statutory factors in aggravation." *Id.* at 25. The supreme court stated that, "[i]n view of the comments made by the circuit court at sentencing, we conclude that, in order to remove any suggestion of unfairness, this case *should* be assigned to a different judge on remand." (Emphasis added.) *Id.* (citing *People v. Dameron*, 196 Ill. 2d 156, 179 (2001)). In *Dameron*, the trial court relied on evidence outside the record in sentencing the defendant to death, which violated the defendant's right to due process. *Dameron*, 196 Ill. 2d at 170-74. Defendant cites no comments or activity by the trial court in this case that raises any suggestion of unfairness.

¶ 72    The record shows that defense counsel argued, and the trial court was aware, that our mandate in *Reyes* required a determination by the trial court that "defendant is beyond rehabilitation" before defendant could be given a *de facto* life sentence. During the hearing on defendant's motion to reconsider the sentence, the trial court explained its reasoning:

> "I had an opportunity to review the various cases cited. As I indicated in my initial sentencing findings and orders, that I considered not only the prior felony history of this particular case but a number of other cases in the State of Illinois as well as the federal cases.

I think that having considered all of these things, I still believe and will find that I believe that *Jones* [*v.*] *Mississippi* decision released by the U.S. Supreme Court on their opinion issued on April 22nd of this year still provides substantial guidance, particularly when considering it in the light of other U.S. Supreme Court cases, *Roper* [*v.*] *Simmons*, 543 U.S. 551 from 2005. *Miller* [*v.*] *Alabama*, 567 U.S. 460, 2012. *Montgomery* [*v.*] *Louisiana*, 577 U.S. 190, a 2016 case.

So I think there's a progeny of cases heard and rulings made by the U.S. Supreme Court, and *Jones* [*v.*] *Mississippi* just being the latest in a long line of cases going back to 2005.

To say that I should focus only on *Miller* [*v.*] *Alabama* and ignore the other U.S. Supreme Court cases I'm not sure is entirely correct. I don't believe the courts in Illinois have the option of considering some of the of the U.S. Supreme Court and ignoring others. Just as they don't have the option to consider some cases by the Illinois Supreme Court or Illinois Appellate Court for the Second District and ignoring others.

I think the case law in its entirety as it is and that while certainly the Appellate Court in the prior most recent appeal did make certain findings, this was also before *Jones* [*v.*] *Mississippi* which I believe this [c]ourt has fully complied with all those requirements.

* * *

I understand the issues with the [*de facto*] life sentence. Again, on the day of sentencing, having come shortly after the issuance of the opinion in *Jones* [*v.*] *Mississippi*, the sentence that was imposed is consistent with the law that existed on the date that I sentenced him."

¶ 73   It is apparent to me that the trial court believed that, because the United States Supreme Court made clear in *Jones* that the eighth amendment did not require a finding that defendant was

beyond rehabilitation, it was not required to follow our mandate. See *In re N.G.*, 2018 IL 121939, ¶ 41 ("State courts are under a mandatory obligation to adhere to this federal constitutional command. Under the supremacy clause of the federal constitution (U.S. Const., art. VI, cl. 2), ' "[w]e are bound to follow the United States Supreme Court's interpretation of the Constitution of the United States." [Citation.] This means that when the Supreme Court adopts a particular framework for applying a federal constitutional provision, we are required to follow that framework, regardless of how other courts, including this one, may have approached the issue in other decisions. [Citation.]' "). I also note that defendant has not cited any authority for the proposition that a trial court's failure to follow an appellate court's mandate requires the assignment of the case to a new judge on remand.

¶ 74     The majority cites *Heider* and *People v. Woods*, 2018 IL App (1st) 153323, ¶ 39, in support of ordering the assignment of a new judge on remand. Like *Heider*, *Woods* is distinguishable. In *Woods*, the defendant was convicted of two counts of armed robbery, after a bench trial. *Id.* ¶ 1. The defendant " 'declined to answer any questions pertaining to his investigation' " put to him by the probation officer in preparation of the initial "PSI report." *Id.* ¶ 9. The trial court ordered the defendant to " 'speak with them.' " *Id.* On appeal, the appellate court held that the defendant's fifth amendment right against compelled self-incrimination was violated when the trial court ordered him to answer questions and "then the judge used that information to increase [the defendant's] sentence." *Id.* ¶ 34. The appellate court also noted that, at the sentencing, the trial court used information that was potentially mitigating "as only negative." *Id.* ¶ 35. "For example, [the defendant] reported that he was a *former* gang member who had quit because he 'wanted to be a positive role model for his younger half-brothers.' " (Emphasis in original.) *Id.* "The trial court did not mention this, but instead referred repeatedly to his membership in 'gangs.' " *Id.* Like

in *Heider*, the appellate court in *Woods* cited specific comments by the trial court that suggested unfairness.

¶ 75    The record in this case does not raise any suggestion of unfairness, and defendant makes no such claim. The majority's sole ground for the assignment of a new judge is that the trial court decided to follow the United States Supreme Court's opinion in *Jones*, rather than our mandate. The majority cites *People ex rel. Daley v. Schreier*, 92 Ill. 2d 271, 276 (1982), for the proposition that a trial court must obey our mandates. *Supra* ¶ 56. The majority also cites *Chicago Ry. Equipment Co. v. National Hollow Brake Beam Co.*, 239 Ill. 111, 115 (1909), for the proposition that a reviewing court's directions must be followed even if they are erroneous. *Supra* ¶ 56. I generally agree with my colleagues. However, neither of the cases cited involved a remand for a hearing before a new judge. In *Schreier*, the trial court violated our supreme court's supervisory order that "remanded to the circuit court with directions to resentence defendants in accordance with law." (Emphasis and internal quotation marks omitted.) *Schreier*, 92 Ill. 2d at 274. On remand, the trial court granted the defendants' motion for a new trial instead of resentencing the defendant. *Id.* at 275. The supreme court issued a writ of mandamus directing the trial court "to comply with our prior mandate and to resentence defendants as Class X felons." *Id.* at 279.

¶ 76    In *Chicago Ry. Equipment Co.*, the case was before our supreme court for a second time following its reversal and remand in *National Hollow Brake-Beam Co. v. Chicago Ry. Equipment Co.*, 226 Ill. 28 (1907). Our supreme court determined that the trial court followed its "remanding order," rejecting the argument that the trial court failed to follow the mandate. *Chicago Ry. Equipment Co.*, 239 Ill. at 115-16. Our supreme court stated that "[t]he decree of the lower court was in substantial compliance with the directions of this court." *Id.* at 116.

¶ 77    The record in this case contains zero evidence that the trial court exhibited any bias or prejudice towards the defendant. The majority's displeasure with the trial court's decision to

follow *Jones*, which seriously questions our supreme court's holding in *Holman*,[4] is not a recognized ground, in and of itself, to require the assignment of a new judge. While we have the power to order the assignment of a new judge upon remand, concluding that a judge is disqualified because of prejudice is not a matter to be taken lightly. *People v. Vance*, 76 Ill. 2d 171, 179 (1979). "It will be viewed by some as reflecting unfavorably upon the judge, and it tends to disrupt the orderly functioning of the judicial system." *Id.* I respectfully dissent from the portion of the majority's opinion requiring the assignment of a new judge on remand.

---

[4]In *People v. Dorsey*, 2021 IL 123010, ¶ 41, our supreme court noted that its holding in *Holman* "is questionable in light of *Jones*."

*People v. Reyes*, **2023 IL App (2d) 210423**

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Kendall County, No. 09-CF-505; the Hon. Robert P. Pilmer, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Douglas R. Hoff, and Christopher L. Gehrke, of State Appellate Defender's Office, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Eric C. Weiss, State's Attorney, of Yorkville (Patrick Delfino, Edward R. Psenicka, and David Friedland, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |